INVESTMENT COMPANY INSTITUTE ET AL. *v.*
CAMP, COMPTROLLER OF THE CURRENCY,
ET AL.

No. 61. Argued December 15, 1970—Decided April 5, 1971*

STEWART, J., delivered the opinion of the Court, in which BLACK,
DOUGLAS, BRENNAN, WHITE, and MARSHALL, JJ., joined. HARLAN,

*Together with No. 59, *National Association of Securities Dealers,
Inc.* v. *Securities and Exchange Commission et al.*, argued December
14–15, 1970, also on certiorari to the same court.

J., *post*, p. 639, and BLACKMUN, J., *post*, p. 642, filed dissenting opinions. BURGER, C. J., took no part in the consideration or decision of these cases.

*G. Duane Vieth* argued the cause for petitioners in No. 61. With him on the briefs were *James F. Fitzpatrick, Melvin Spaeth,* and *Robert Augenblick. Joseph B. Levin* argued the cause for petitioner in No. 59. With him on the briefs was *Lloyd J. Derrickson.*

*Deputy Solicitor General Friedman* argued the cause for respondent Camp, Comptroller of the Currency, in No. 61. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Richard B. Stone, Alan S. Rosenthal, Leonard Schaitman,* and *C. Westbrook Murphy. Mr. Friedman,* by special leave of Court, argued the cause for the United States as *amicus curiae* urging affirmance in No. 59. With him on the brief were *Solicitor General Griswold* and *Mr. Stone. Archibald Cox* argued the cause for respondent First National City Bank in both cases. With him on the brief was *Stephen Ailes.*

*Robert L. Stern* filed a brief for Corporate Fiduciaries Association of Chicago as *amicus curiae* urging affirmance in both cases.

MR. JUSTICE STEWART delivered the opinion of the Court.

These companion cases involve a double-barreled assault upon the efforts of a national bank to go into the business of operating a mutual investment fund. The petitioners in No. 61 are an association of open-end investment companies and several individual such companies. They brought an action in the United States District Court for the District of Columbia, attacking portions of Regulation 9 issued by the Comptroller of the

Currency,[1] on the ground that this Regulation, in purporting to authorize banks to establish and operate collective investment funds, sought to permit activities prohibited to national banks or their affiliates by various provisions of the Glass-Steagall Banking Act of 1933, 48 Stat. 162.[2] The petitioners also specifically attacked the Comptroller's approval of the application of First National City Bank of New York for permission to establish and operate a collective investment fund. In No. 59 the National Association of Securities Dealers filed a petition in the United States Court of Appeals for the District of Columbia Circuit seeking review of an order of the Securities and Exchange Commission that partially exempted the collective investment fund of First National City Bank of New York from various provisions of the Investment Company Act of 1940.[3]

In No. 61 the District Court concluded that the challenged provisions of Regulation 9 were invalid under the Glass-Steagall Act.[4] The Comptroller and First National City Bank appealed from this decision, and the appeal was consolidated with the petition for review in No. 59. The Court of Appeals held that the actions taken by the Securities and Exchange Commission and the Comptroller were fully consonant with the statutes committed to their regulatory supervision. Accordingly, it affirmed the order of the Commission and reversed the judgment of the District Court.[5] We granted certiorari to consider important questions presented under federal regu-

---

[1] 12 CFR Pt. 9 (1970).

[2] The provisions of the Glass-Steagall Act are codified in various sections scattered through Title 12 of the United States Code.

[3] The exemption was granted in response to an application filed pursuant to § 6 (c) of the Act, 54 Stat. 802, 15 U. S. C. § 80a–6 (c).

[4] 274 F. Supp. 624.

[5] 136 U. S. App. D. C. 241, 420 F. 2d 83.

latory statutes.[6] For the reasons that follow, we hold Regulation 9 invalid insofar as it authorizes the sale of interests in an investment fund of the type established by First National City Bank pursuant to the Comptroller's approval. This disposition makes it unnecessary to consider the propriety of the action of the Securities and Exchange Commission in affording this fund exemption from certain of the provisions of the Investment Company Act of 1940.

I

In No. 61 it is urged at the outset that petitioners lack standing to question whether national banks may legally enter a field in competition with them. This contention is foreclosed by *Data Processing Service* v. *Camp,* 397 U. S. 150. There we held that companies that offered data processing services to the general business community had standing to seek judicial review of a ruling by the Comptroller that national banks could make data processing services available to other banks and to bank customers. We held that data processing companies were sufficiently injured by the competition that the Comptroller had authorized to create a case or controversy. The injury to the petitioners in the instant case is indistinguishable. We also concluded that Congress did not intend "to preclude judicial review of administrative rulings by the Comptroller as to the legitimate scope of activities available to national banks under [the National Bank Act]." 397 U. S., at 157. This is precisely the review that the petitioners have sought in this case. Finally, we concluded that Congress had arguably legislated against the competition that the petitioners sought to challenge, and from which flowed their injury. We noted that whether Congress had indeed prohibited such competition was a question for the merits. In the

---

[6] 397 U. S. 986.

discussion that follows in the balance of this opinion we deal with the merits of the petitioners' contentions and conclude that Congress did legislate against the competition that the petitioners challenge. There can be no real question, therefore, of the petitioners' standing in the light of the *Data Processing* case. See also *Arnold Tours* v. *Camp,* 400 U. S. 45.

## II

The issue before us is whether the Comptroller of the Currency may, consistently with the banking laws, authorize a national bank to offer its customers the opportunity to invest in a stock fund created and maintained by the bank. Before 1963 national banks were prohibited by administrative regulation from offering this service. The Board of Governors of the Federal Reserve System, which until 1962 had regulatory jurisdiction over all the trust activities of national banks, allowed the collective investment of trust assets only for "the investment of funds held for true fiduciary purposes." The applicable regulation, Regulation F, specified that "the operation of such Common Trust Funds as investment trusts for other than strictly fiduciary purposes is hereby prohibited." The Board consistently ruled that it was improper for a bank to use "a Common Trust Fund as an investment trust attracting money seeking investment alone and to embark upon what would be in effect the sale of participations in a Common Trust Fund to the public as investments." 26 Fed. Reserve Bull. 393 (1940); see also 42 Fed. Reserve Bull. 228 (1956); 41 Fed. Reserve Bull. 142 (1955).

In 1962 Congress transferred jurisdiction over most of the trust activities of national banks from the Board of Governors of the Federal Reserve System to the Comptroller of the Currency, without modifying any provision

of substantive law. Pub. L. 87–722, 76 Stat. 668, 12
U. S. C. § 92a. The Comptroller thereupon solicited sug-
gestions for improving the regulations applicable to trust
activities. Subsequently, new regulations were proposed
which expressly authorized the collective investment of
monies delivered to the bank for investment management,
so-called managing agency accounts. These proposed
regulations were officially promulgated in 1963 with
changes not material here.[7] In 1965 the First National
City Bank of New York submitted for the Comptroller's
approval a plan for the collective investment of managing
agency accounts. The Comptroller promptly approved
the plan, and it is now in operation. This plan, which
departs in some respects from the plan envisaged by the
Comptroller's Regulation, is expected, the briefs tell us,
to be a model for other banks which decide to offer their
customers a collective investment service.[8]

Under the plan the bank customer tenders between
$10,000 and $500,000 to the bank, together with an
authorization making the bank the customer's managing
agent. The customer's investment is added to the fund,
and a written evidence of participation is issued which
expresses in "units of participation" the customer's pro-
portionate interest in fund assets. Units of participation
are freely redeemable, and transferable to anyone who
has executed a managing agency agreement with the bank.
The fund is registered as an investment company under
the Investment Company Act of 1940. The bank is

---

[7] 12 CFR § 9.18 (a) provides that: "Where not in contravention
of local law, funds held by a national bank as fiduciary may be
invested collectively: . . . (3) In a common trust fund, maintained
by the bank exclusively for the collective investment and reinvest-
ment of monies contributed thereto by the bank in its capacity as
managing agent under a managing agency agreement expressly pro-
viding that such monies are received by the bank in trust . . . ."

[8] For example, the investment fund plan as established does not
provide that the bank receives the investor's money in trust.

the underwriter of the fund's units of participation within the meaning of that Act. The fund has filed a registration statement pursuant to the Securities Act of 1933. The fund is supervised by a five-member committee elected annually by the participants pursuant to the Investment Company Act of 1940. The Securities and Exchange Commission has exempted the fund from the Investment Company Act to the extent that a majority of this committee may be affiliated with the bank, and it is expected that a majority always will be officers in the bank's trust and investment division.[9] The actual custody and investment of fund assets is carried out by the bank as investment advisor pursuant to a management agreement. Although the Investment Company Act requires that this management agreement be approved annually by the committee, including a majority of the unaffiliated members, or by the participants, it is expected that the bank will continue to be investment advisor.

### III

Section 16 of the Glass-Steagall Act as amended, 12 U. S. C. § 24, Seventh, provides that the "business of dealing in securities and stock [by a national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account . . . . Except as hereinafter provided or otherwise permitted by law, nothing herein contained shall authorize the purchase by [a national bank] for its own account of any shares of stock of any corporation."[10] The peti-

---

[9] The opinion of the Commission and the dissent of Commissioner Budge are unofficially reported at CCH Fed. Sec. L. Rep., 1964–1966 Decisions, ¶ 77,332.

[10] Section 16, as enacted in 1933, granted no authority to purchase stock for the account of customers and prohibited any purchase of stock by a national bank. The 1935 Amendments to the

tioners contend that a purchase of stock by a bank's investment fund is a purchase of stock by a bank for its own account in violation of this section.

Section 16 also provides that a national bank "shall not underwrite any issue of securities or stock." And § 21 of the same Act, 12 U. S. C. § 378 (a), provides that "it shall be unlawful—(1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of [deposit banking]." The petitioners contend that the creation and operation of an investment fund by a bank which offers to its customers the opportunity to purchase an interest in the fund's assets constitutes the issuing, underwriting, selling, or distributing of securities or stocks in violation of these sections.

The questions raised by the petitioners are novel and substantial. National banks were granted trust powers in 1913. Federal Reserve Act, § 11, 38 Stat. 261. The first common trust fund was organized in 1927, and such funds were expressly authorized by the Federal Reserve Board by Regulation F promulgated in 1937. Report on Commingled or Common Trust Funds Administered by Banks and Trust Companies, H. R. Doc. No. 476, 76th Cong., 2d Sess., 4–5 (1939). For at least a generation, therefore, there has been no reason to doubt that a national bank can, consistently with the banking laws, commingle trust funds on the one hand, and act as a managing agent on the other. No provision of the bank-

National Bank Act included a provision intended to make it clear that a national bank may buy stock for the account of customers but not for its own account. S. Rep. No. 1007, 74th Cong., 1st Sess., 17; H. R. Rep. No. 742, 74th Cong., 1st Sess., 18.

ing law suggests that it is improper for a national bank to pool trust assets, or to act as a managing agent for individual customers, or to purchase stock for the account of its customers. But the union of these powers gives birth to an investment fund whose activities are of a different character. The differences between the investment fund that the Comptroller has authorized and a conventional open-end mutual fund are subtle at best, and it is undisputed that this bank investment fund finds itself in direct competition with the mutual fund industry. One would suppose that the business of a mutual fund consists of buying stock "for its own account" and of "issuing" and "selling" "stock" or "other securities" evidencing an undivided and redeemable interest in the assets of the fund.[11] On their face, §§ 16 and 21 of the Glass-Steagall Act appear clearly to prohibit this activity by national banks.[12]

---

[11] A mutual fund is an open-end investment company. The Investment Company Act of 1940 defines an investment company as an "issuer" of "any security" which "is or holds itself out as being engaged primarily . . . in the business of investing . . . in securities . . . ." 15 U. S. C. §§ 80a-2 (a)(21), 80a-3 (a)(1). An open-end company is one "which is offering for sale or has outstanding any redeemable security of which it is the issuer." 15 U. S. C. § 80a-5 (a)(1). An investment company also includes a "unit investment trust": an investment company which, among other things, "is organized under a . . . contract of . . . agency . . . and . . . issues only redeemable securities, each of which represents an undivided interest in a unit of specified securities . . . ." 15 U. S. C. § 80a-4 (2).

[12] Section 20 of the Act, 12 U. S. C. § 377, prohibits affiliations between banks that are members of the Federal Reserve System and organizations "engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities . . . ." And § 32, 12 U. S. C. § 78, provides that no officer, director, or employee of a bank in the Federal Reserve System may serve at the same time as officer, director, or employee of an association primarily engaged in the activity de-

But we cannot come lightly to the conclusion that the Comptroller has authorized activity that violates the banking laws. It is settled that courts should give great weight to any reasonable construction of a regulatory

scribed in § 20. The petitioners contend that if a bank's investment fund be conceived as an entity distinct from the bank, then its affiliation with the investment fund is in violation of these sections.

The Board of Governors has had occasion to consider whether an investment fund of the type operated by First National City Bank involves a violation of § 32 of the Glass-Steagall Act. 12 CFR § 218.111 (1970). The Board concluded, based on "general principles that have been developed in respect to the application of section 32," that it would not violate that section for officers of the bank's trust department to serve at the same time as officers of the investment fund because the fund and the bank "constitute a single entity," and the fund "would be regarded as nothing more than an arm or department of the bank." The Board called attention to § 21 whose provisions it summarized as forbidding "a securities firm or organization to engage in the business of receiving deposits, subject to certain exceptions." The Board, however, declined to express a position concerning the applicability of this section because of its policy not to express views as to the meaning of statutes that carry criminal penalties. Nor has the Board expressed its views on the application of any other provision of the banking law to the creation and operation of a bank investment fund.

We have no doubt but that the Board's construction and application of § 32 is both reasonable and rational. The investment fund service authorized by the Comptroller's regulation and as provided by the First National City Bank is a service available only to customers of the bank. It is held out as a service provided by the bank, and the investment fund bears the bank's name. The bank has effective control over the activities of the investment fund. Moreover, there is no danger that to characterize the bank and its fund as a single entity will disserve the purpose of Congress. The limitations that the banking laws place on the activities of national banks are at least as great as the limitations placed on the activities of their affiliates. For example, § 32 refers to the "public sale" of stocks or securities while § 21 proscribes the "selling" of stocks or securities.

statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws. See *First National Bank* v. *Missouri*, 263 U. S. 640, 658.

The difficulty here is that the Comptroller adopted no expressly articulated position at the administrative level as to the meaning and impact of the provisions of §§ 16 and 21 as they affect bank investment funds. The Comptroller promulgated Regulation 9 without opinion or accompanying statement. His subsequent report to Congress did not advert to the prohibitions of the Glass-Steagall Act. Comptroller of the Currency, 101st Annual Report 14–15 (1963).[13] To be sure, counsel for the

---

[13] A law review article written by Comptroller Saxon and Deputy Comptroller Miller in 1965 did take the position that the Glass-Steagall Act is inapplicable to bank common trust funds. Saxon & Miller, Common Trust Funds, 53 Geo. L. J. 994 (1965). But this view was predicated on the argument that when Congress in 1936 provided a tax exemption for common trust funds maintained by a bank, now 26 U. S. C. § 584, it contemplated the exemption of common trust funds created for strictly investment purposes, and that consequently Congress must have assumed that the banking laws, which otherwise appear to proscribe such funds, were not applicable. *Id.*, at 1008–1010. Whatever the merits of this argument, it has no bearing on the instant litigation. It is clear that the collective investment funds authorized by Regulation 9 need not qualify for tax exemption under § 584; the First National City Bank Fund does not so qualify. Moreover, the position advanced in the brief filed on behalf of the Comptroller in this litigation is not that the banking laws are inapplicable to bank investment funds, but rather that the creation and operation of such funds are consistent with the banking laws.

It is noteworthy that the § 584 exemption is available to common trust funds "maintained by a bank . . . exclusively for the collective

Comptroller in the course of this litigation, and specifically in his briefs and oral argument in this Court, has rationalized the basis of Regulation 9 with great professional competence. But this is hardly tantamount to an administrative interpretation of §§ 16 and 21. In *Burlington Truck Lines* v. *United States,* 371 U. S. 156, we said, "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . . For the courts to substitute their or counsel's discretion for that of the [agency] is incompatible with the orderly functioning of the process of judicial review." *Id.,* at 168–169. Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands. It is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress. Quite obviously the Comptroller should not grant new authority to national banks until he is satisfied that the exercise of this authority will not violate the intent of the banking laws. If he faces such questions only after he has acted, there is substantial danger that the momentum generated by initial approval may seriously impair the enforcement of the banking laws that Congress enacted.

---

investment and reinvestment of moneys contributed thereto by the bank in its capacity as a *trustee, executor, administrator, or guardian* . . . ." (Emphasis added.) This language, which makes no reference to contributions by the bank in its capacity as managing agent, is identical to that exempting such common trust funds from the Investment Company Act of 1940, 15 U. S. C. § 80a–3 (c)(3). The Securities and Exchange Commission has taken the position that commingled managing agency accounts do not come within § 80a–3 (c)(3). See Statement of Commissioner Cary, Hearings on Common Trust Funds—Overlapping Responsibility and Conflict in Regulation, before a Subcommittee of the House Committee on Government Operations, 88th Cong., 1st Sess., 3 (1963).

## IV

There is no dispute that one of the objectives of the Glass-Steagall Act was to prohibit commercial banks, banks that receive deposits subject to repayment, lend money, discount and negotiate promissory notes and the like, from going into the investment banking business. Many commercial banks were indirectly engaged in the investment banking business when the Act was passed in 1933. Even before the passage of the Act it was generally believed that it was improper for a commercial bank to engage in investment banking directly.[14] But in 1908 banks began the practice of establishing security affiliates that engaged in, *inter alia,* the business of floating bond issues and, less frequently, underwriting stock issues.[15] The Glass-Steagall Act confirmed that national banks could not engage in investment banking directly, and in addition made affiliation with an organization so engaged illegal. One effect of the Act was to abolish the security affiliates of commercial banks.[16]

It is apparent from the legislative history of the Act why Congress felt that this drastic step was necessary. The failure of the Bank of United States in 1930 was widely attributed to that bank's activities with respect to its numerous securities affiliates.[17] Moreover, Con-

---

[14] Hearings Pursuant to S. Res. 71 before a Subcommittee of the Senate Committee on Banking and Currency (hereafter 1931 Hearings), 71st Cong., 3d Sess., 40 (1931); 1920 Report of the Comptroller of the Currency, quoted *id.*, at 1067, 1068. Senator Glass, commenting on earlier banking legislation, said, "We tried to, and thought at the time we had, removed the system as far as possible from the influence of the stock market." *Id.*, at 262.

[15] *Id.*, at 1052.

[16] Report on Investment Trusts and Investment Companies, pt. 2, H. R. Doc. No. 70, 76th Cong., 1st Sess., 59 (1939).

[17] 1931 Hearings 116–117, 1017, 1068.

gress was concerned that commercial banks in general and member banks of the Federal Reserve System in particular had both aggravated and been damaged by stock market decline partly because of their direct and indirect involvement in the trading and ownership of speculative securities.[18] The Glass-Steagall Act reflected a determination that policies of competition, convenience, or expertise which might otherwise support the entry of commercial banks into the investment banking business were outweighed by the "hazards" and "financial dangers" that arise when commercial banks engage in the activities proscribed by the Act.[19]

The hazards that Congress had in mind were not limited to the obvious danger that a bank might invest its own assets in frozen or otherwise imprudent stock or security investments. For often securities affiliates had operated without direct access to the assets of the bank. This was because securities affiliates had frequently been established with capital paid in by the bank's stockholders, or by the public, or through the allocation of a legal dividend on bank stock for this purpose.[20] The legislative history of the Glass-Steagall Act shows that Congress also had in mind and repeatedly focused on the more subtle hazards that arise when a commercial bank goes beyond the business of acting as fiduciary or managing agent and enters the investment banking business either directly or by establishing an affiliate to hold and sell particular investments. This course places new promotional and other pressures on the bank which in turn create new

---

[18] See S. Rep. No. 77, 73d Cong., 1st Sess., 6, 8, 10.

[19] *Id.*, at 18; see 1931 Hearings 365; 75 Cong. Rec. 9911 (remarks of Sen. Bulkley).

[20] 1931 Hearings 41, 192, 1056; 1920 Report of the Comptroller of the Currency, quoted *id.*, at 1067.

temptations. For example, pressures are created because the bank and the affiliate are closely associated in the public mind, and should the affiliate fare badly, public confidence in the bank might be impaired. And since public confidence is essential to the solvency of a bank, there might exist a natural temptation to shore up the affiliate through unsound loans or other aid.[21] Moreover, the pressure to sell a particular investment and to make the affiliate successful might create a risk that the bank would make its credit facilities more freely available to those companies in whose stock or securities the affiliate has invested or become otherwise involved. Congress feared that banks might even go so far as to make unsound loans to such companies.[22] In any event, it was thought that the bank's salesman's interest might impair its ability to function as an impartial source of credit.[23]

Congress was also concerned that bank depositors might suffer losses on investments that they purchased in reliance on the relationship between the bank and its affiliate.[24] This loss of customer good will might "become an important handicap to a bank during a major period of security market deflation."[25] More broadly,

---

[21] 1931 Hearings 20, 237, 1063. See also *id.*, at 1058, where it is said:

"Activities of a bank's security affiliate as a holding or finance company or an investment trust are also fraught with the danger of large losses during a deflation period. Bank affiliates of this kind show a much greater tendency to operate with borrowed funds than do organizations of this type which are independent of banks, the reason being that the identity of control and management which prevails between the bank and its affiliate tends to encourage reliance upon the lending facilities of the former."

[22] See *id.*, at 1064; 75 Cong. Rec. 9912 (remarks of Sen. Bulkley).

[23] See 1931 Hearings 87 (remarks of Chairman Glass).

[24] See 77 Cong. Rec. 4028 (remarks of Rep. Fish).

[25] 1931 Hearings 1064.

Congress feared that the promotional needs of investment banking might lead commercial banks to lend their reputation for prudence and restraint to the enterprise of selling particular stocks and securities, and that this could not be done without that reputation being undercut by the risks necessarily incident to the investment banking business.[26] There was also perceived the danger that when commercial banks were subject to the promotional demands of investment banking, they might be tempted to make loans to customers with the expectation that the loan would facilitate the purchase of stocks and securities.[27] There was evidence before Congress that loans for investment written by commercial banks had done much to feed the speculative fever of the late 1920's.[28] Senator Glass made it plain that it was "the fixed purpose of Congress" not to see the facilities of commercial banking diverted into speculative operations by the aggressive and promotional character of the investment banking business.[29]

---

[26] See 75 Cong. Rec. 9912:

"And although such a loss would possibly not result in any substantial impairment of the resources of the banking institution owning that affiliate . . . there can be no doubt that the whole transaction tends to discredit the bank and impair the confidence of its depositors." (Remarks of Sen. Bulkley.)

[27] S. Rep. No. 77, 73d Cong., 1st Sess., 9–10.

[28] 1931 Hearings 1006–1029; S. Rep. No. 77, 73d Cong., 1st Sess., 8–9.

[29] 75 Cong. Rec. 9884. See also S. Rep. No. 77, 73d Cong., 1st Sess., 8:

"The outstanding development in the commercial banking system during the prepanic period was the appearance of excessive security loans, and of overinvestment in securities of all kinds. The effects of this situation in changing the whole character of the banking problem can hardly be overemphasized. National banks were never intended to undertake investment banking business on a large scale, and the whole tenor of legislation and administrative rulings concern-

Another potential hazard that very much concerned Congress arose from the plain conflict between the promotional interest of the investment banker and the obligation of the commercial banker to render disinterested investment advice. Senator Bulkley stated:

> "Obviously, the banker who has nothing to sell to his depositors is much better qualified to advise disinterestedly and to regard diligently the safety of depositors than the banker who uses the list of depositors in his savings department to distribute circulars concerning the advantages of this, that, or the other investment on which the bank is to receive an originating profit or an underwriting profit or a distribution profit or a trading profit or any combination of such profits." [30]

Congress had before it evidence that security affiliates might be driven to unload excessive holdings through the trust department of the sponsor bank.[31] Some witnesses at the hearings expressed the view that this practice constituted self-dealing in violation of the trustee's obligation of loyalty, and indeed that it would be improper for a bank's trust department to purchase anything from the bank's securities affiliate.[32]

---

ing them has been away from recognition of such a growth in the direction of investment banking as legitimate."

In the same vein Representative Steagall said:

"Our great banking system was diverted from its original purposes into investment activities . . . .

.        .        .        .        .

"The purpose of the regulatory provisions of this bill is to call back to the service of agriculture and commerce and industry the bank credit and the bank service designed by the framers of the Federal Reserve Act." 77 Cong. Rec. 3835.

[30] 75 Cong. Rec. 9912.
[31] 1931 Hearings 237; cf. *id.*, at 1064.
[32] *Id.*, at 266, 300, 311.

In sum, Congress acted to keep commercial banks out of the investment banking business largely because it believed that the promotional incentives of investment banking and the investment banker's pecuniary stake in the success of particular investment opportunities was destructive of prudent and disinterested commercial banking and of public confidence in the commercial banking system. As Senator Bulkley put it:

"If we want banking service to be strictly banking service, without the expectation of additional profits in selling something to customers, we must keep the banks out of the investment security business." [33]

## V

The language that Congress chose to achieve this purpose includes the prohibitions of § 16 that a national bank "shall not underwrite any issue of securities or stock" and shall not purchase "for its own account . . . any shares of stock of any corporation," and the prohibition of § 21 against engaging in "the business of issuing, underwriting, selling, or distributing . . . stocks, bonds, debentures, notes, or other securities." In this litigation the Comptroller takes the position that the operation of a bank investment fund is consistent with these provisions, because participating interests in such a fund are not "securities" within the meaning of the Act. It is argued that a bank investment fund simply makes available to the small investor the benefit of investment management by a bank trust department which would otherwise be available only to large investors, and that the operation of an investment fund creates no problems that are not present whenever a bank invests in securities for the account of customers.

---

[33] 75 Cong. Rec. 9912.

But there is nothing in the phrasing of either § 16 or § 21 that suggests a narrow reading of the word "securities." To the contrary, the breadth of the term is implicit in the fact that the antecedent statutory language encompasses not only equity securities but also securities representing debt. And certainly there is nothing in the language of these provisions to suggest that the sale of an interest in the business of buying, holding, and selling stocks for investment is to be distinguished from the sale of an interest in a commercial or industrial enterprise.

Indeed, there is direct evidence that Congress specifically contemplated that the word "security" includes an interest in an investment fund. The Glass-Steagall Act was the product of hearings conducted pursuant to Senate Resolution 71 which included among the topics to be investigated the impact on the banking system of the formation of investment and security trusts.[34] The subcommittee found that one of the activities in which bank security affiliates engaged was that of an investment trust: "buying and selling securities acquired purely for investment or speculative purposes."[35] Since Congress generally intended to divorce commercial banking from the kinds of activities in which bank security affiliates engaged, there is reason to believe that Congress explicitly intended to prohibit a national bank from operating an investment trust.[36]

But, in any event, we are persuaded that the purposes for which Congress enacted the Glass-Steagall Act leave no room for the conclusion that a participation in a bank investment fund is not a "security" within the

[34] S. Res. 71, 71st Cong., 2d Sess., is reprinted in S. Rep. No. 77, 73d Cong., 1st Sess., 1.

[35] 1931 Hearings 1057. See also id., at 307.

[36] See also supra, n. 21.

meaning of the Act. From the perspective of competition, convenience, and expertise, there are arguments to be made in support of allowing commercial banks to enter the investment banking business. But Congress determined that the hazards outlined above made it necessary to prohibit this activity to commercial banks. Those same hazards are clearly present when a bank undertakes to operate an investment fund.

A bank that operates an investment fund has a particular investment to sell. It is not a matter of indifference to the bank whether the customer buys an interest in the fund or makes some other investment. If its customers cannot be persuaded to invest in the bank's investment fund, the bank will lose their investment business and the fee which that business would have brought in. Even as to accounts large enough to qualify for individual investment management, there might be a potential for a greater profit if the investment were placed in the fund rather than in individually selected securities, because of fixed costs and economies of scale. The mechanics of operating an investment fund might also create promotional pressure. When interests in the fund were redeemed, the bank would be effectively faced with the choice of selling stocks from the fund's portfolio or of selling new participations to cover redemptions. The bank might have a pecuniary incentive to choose the latter course in order to avoid the cost of stock transactions undertaken solely for redemption purposes.

Promotional incentives might also be created by the circumstance that the bank's fund would be in direct competition with mutual funds that, from the point of view of the investor, offered an investment opportunity comparable to that offered by the bank. The bank would want to be in a position to show to the prospective customer that its fund was more attractive than the mutual funds offered by others. The bank would have

a salesman's stake in the performance of the fund, for if the fund were less successful than the competition the bank would lose business and the resulting fees.

A bank that operated an investment fund would necessarily put its reputation and facilities squarely behind that fund and the investment opportunity that the fund offered. The investments of the fund might be conservative or speculative, but in any event the success or failure of the fund would be a matter of public record. Imprudent or unsuccessful management of the bank's investment fund could bring about a perhaps unjustified loss of public confidence in the bank itself. If imprudent management should place the fund in distress, a bank might find itself under pressure to rescue the fund through measures inconsistent with sound banking.

The promotional and other pressures incidental to the operation of an investment fund, in other words, involve the same kinds of potential abuses that Congress intended to guard against when it legislated against bank security affiliates. It is not the slightest reflection on the integrity of the mutual fund industry to say that the traditions of that industry are not necessarily the conservative traditions of commercial banking. The needs and interests of a mutual fund enterprise more nearly approximate those of securities underwriting, the activity in which bank security affiliates were primarily engaged. When a bank puts itself in competition with mutual funds, the bank must make an accommodation to the kind of ground rules that Congress firmly concluded could not be prudently mixed with the business of commercial banking.

And there are other potential hazards of the kind Congress sought to eliminate with the passage of the Glass-Steagall Act. The bank's stake in the investment fund might distort its credit decisions or lead to unsound loans to the companies in which the fund had invested. The bank might exploit its confidential

relationship with its commercial and industrial creditors for the benefit of the fund. The bank might undertake, directly or indirectly, to make its credit facilities available to the fund or to render other aid to the fund inconsistent with the best interests of the bank's depositors. The bank might make loans to facilitate the purchase of interests in the fund. The bank might divert talent and resources from its commercial banking operation to the promotion of the fund. Moreover, because the bank would have a stake in a customer's making a particular investment decision—the decision to invest in the bank's investment fund—the customer might doubt the motivation behind the bank's recommendation that he make such an investment. If the fund investment should turn out badly there would be a danger that the bank would lose the good will of those customers who had invested in the fund. It might be unlikely that disenchantment would go so far as to threaten the solvency of the bank. But because banks are dependent on the confidence of their customers, the risk would not be unreal.

These are all hazards that are not present when a bank undertakes to purchase stock for the account of its individual customers or to commingle assets which it has received for a true fiduciary purpose rather than for investment. These activities, unlike the operation of an investment fund, do not give rise to a promotional or salesman's stake in a particular investment; they do not involve an enterprise in direct competition with aggressively promoted funds offered by other investment companies; they do not entail a threat to public confidence in the bank itself; and they do not impair the bank's ability to give disinterested service as a fiduciary or managing agent. In short, there is a plain difference between the sale of fiduciary services and the sale of investments.[37]

---

[37] See 26 Fed. Reserve Bull. 393 (1940), quoted *supra*, at 621.

## VI

The Glass-Steagall Act was a prophylactic measure directed against conditions that the experience of the 1920's showed to be great potentials for abuse. The literal terms of that Act clearly prevent what the Comptroller has sought to authorize here. Because the potential hazards and abuses that flow from a bank's entry into the mutual investment business are the same basic hazards and abuses that Congress intended to eliminate almost 40 years ago, we cannot but apply the terms of the federal statute as they were written. We conclude that the operation of an investment fund of the kind approved by the Comptroller involves a bank in the underwriting, issuing, selling, and distributing of securities in violation of §§ 16 and 21 of the Glass-Steagall Act. Accordingly, we reverse the judgment in No. 61 and vacate the judgment in No. 59.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the consideration or decision of these cases.

MR. JUSTICE HARLAN, dissenting.

The Court holds that the Investment Company Institute has standing as a competitor to challenge the action of the Comptroller of the Currency because Congress "arguably legislated against the competition that the petitioners sought to challenge, and from which flowed their injury." The ICI, says the Court, is entitled to prevail because "Congress *did* legislate against the competition that the petitioners challenge." *Ante,* at 620, 621 (emphasis added.) I understand the Court to mean by "legislated against the competition" not only that Congress prohibited banks from entering this field of endeavor, but that it did so in part for reasons stemming from the fact

of the resulting competition. See *ante,* at 631–634, 636–638. However, the Court cannot mean by this phrase that it was Congress' purpose to protect petitioners' class against competitive injury for, as all three judges on the court below agreed, neither the language of the pertinent provisions of the Glass-Steagall Act nor the legislative history evinces any congressional concern for the interests of petitioners and others like them in freedom from competition.[1] Indeed, it appears reasonably plain that, if anything, the Act was adopted despite its anticompetitive effects rather than because of them. Cf. *ante,* at 630, 636.

This being the case, the discussion of standing in *Hardin* v. *Kentucky Utilities Co.,* 390 U. S. 1, 5–6 (1968), is directly in point:

"This Court has, it is true, repeatedly held that the economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations. *Railroad Co.* v. *Ellerman,* 105 U. S. 166 (1882); *Alabama Power Co.* v. *Ickes,* 302 U. S. 464 (1938); *Tennessee Power Co.* v. *TVA,* 306 U. S. 118 (1939); *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113 (1940). But competitive injury provided no basis for standing in the above cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury. In contrast, it has been the rule, at least since the *Chicago Junction Case,*

---

[1] "It is equally clear that giving even the broadest reading of the legislative history embellishing the Act will not support the conclusion that Congress meant to bestow upon Appellees any protection from competitive injury." 136 U. S. App. D. C. 241, 263, 420 F. 2d 83, 105 (Burger, J., joined by Miller, J.) (footnote omitted); see also *id.,* at 254, 256–258, 420 F. 2d, at 96, 98–100 (Bazelon, C. J.).

264 U. S. 258 (1924), that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision."

I do not believe that *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970), and *Arnold Tours* v. *Camp,* 400 U. S. 45 (1970), require the opposite result from the one suggested by this passage from *Hardin.* *Data Processing* held that, aside from "case-or-controversy" problems not present here, the crucial question in ruling on a challenge to standing is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U. S., at 153. That question was resolved in favor of the data processors because "§ 4 [of the Bank Service Corporation Act] arguably brings a competitor within the zone of interests protected by it." *Id.,* at 156.[2] In *Arnold Tours* the Court observed that it was again dealing with § 4 of the Bank Service Corporation Act, and that "[n]othing in the [*Data Processing*] opinion limited § 4 to protecting only competitors in the data-processing field." 400 U. S., at 46. Plainly these cases provide little support for the Court's conclusion here that competitors, *as such,* have standing under the Glass-Steagall Act as well.

The Court's holding—that if Congress prohibited entry into a field of business for reasons relating to competition, then a competitor has standing to seek observance of the prohibition—has a surface appeal, but, so far as I can see, no sound analytical basis. Certainly none is offered. In any event, it appears to me that our prior decisions, particularly *Hardin,* require the conclusion that

---

[2] See also *Barlow* v. *Collins,* 397 U. S. 159, 164 (1970).

the petitioners in No. 61 lack standing to challenge the Comptroller's action. While I would not foreclose the possibility that those cases should be further modified in some respect,[3] the Court has not undertaken to re-examine them, and I deem it inappropriate for me to do so as a single Justice.

The view that I take with regard to petitioners' standing in No. 61 makes it unnecessary for me to reach the merits in that case, but it does require me to rule on the contentions made in No. 59. Like MR. JUSTICE BLACK-MUN, see *post*, at 645, I find lengthy discussion of this topic superfluous. At issue is the propriety of the action of the Securities and Exchange Commission in increasing from two to three the number of seats open to bank officers on the five-man committee which serves as a board of directors of the account.[4] Substantially for the reasons given by the judges of the court below, 136 U. S. App. D. C. 241, 249–253, 266, 420 F. 2d 83, 91–95, 108, I am of the opinion that the Commission did not abuse its discretion in determining that the facts of this case made appropriate an exercise of the dispensing power explicitly vested in the Commission by 15 U. S. C. § 80a–6 (c).

For the reasons given herein, I would affirm the two judgments under review.

MR. JUSTICE BLACKMUN, dissenting.

The Court's opinion and judgments here, it seems to me, are based more on what is deemed to be appropriate and desirable national banking *policy* than on what is a necessary judicial construction of the Glass-Steagall Act

---

[3] For one suggestion to this effect, see Jaffe, Standing Again, 84 Harv. L. Rev. 633 (1971).

[4] By virtue of the "person or party aggrieved" provision of the Investment Company Act, 15 U. S. C. § 80a–42 (a), there is no difficulty supporting petitioner's standing in No. 59.

of almost four decades ago. It is a far different thing to be persuaded that it is wise policy to keep national banks out of the business of operating mutual investment funds, despite the safeguards that the Comptroller of the Currency and the Securities and Exchange Commission have provided, than it is to be persuaded that existing and somewhat ancient legislation requires that result. Policy considerations are for the Congress and not for this Court.

I recognize and am fully aware of the factors and of the economic considerations that led to the enactment of the Glass-Steagall Act. The second and third decades of this century are not the happiest chapter in the history of American banking. Deep national concerns emerged from the distressful experiences of those years and from the sad ends to which certain banking practices of that time had led the industry. But those then-prevailing conditions, the legislative history, and the remedy Congress provided, prompt me to conclude that what was proscribed was the involvement and activity of a national bank in investment, as contrasted with commercial, banking, in underwriting and issuing, and in acquiring speculative securities for its own account. These were the banking sins of that time.

The propriety, however, of a national bank's acting, when not in contravention of state or local law, as an *inter vivos* or testamentary trustee, as an executor or administrator, as a guardian or committee, as a custodian, and, indeed, as an agent for the individual customer's securities and funds, see *Carcaba* v. *McNair,* 68 F. 2d 795, 797 (CA5 1934), cert. denied, 292 U. S. 646, is not, and could not be, questioned by the petitioners here or by the Court. This being so, there is, for me, an element of illogic in the ready admission by all concerned, on the one hand, that a national bank has the power to manage, by way of a common trust arrangement, those funds that it holds as fiduciary in the technical sense, and to admin-

ister separate agency accounts, and in the rejection, on the other hand, of the propriety of the bank's placing agency assets into a mutual investment fund. The Court draws its decisional line between the two. I find it impossible to locate any statutory root for that line drawing. To use the Glass-Steagall Act as a tool for that distinction is, I think, a fundamental misconception of the statute.

Accordingly, I am not convinced that the Congress, by that Act or otherwise, as yet has proscribed the banking endeavors under challenge here by competitors in a highly competitive field. None of the judges of the Court of Appeals was so convinced, and neither was the Comptroller of the Currency whose expertise the Court concedes. I would leave to Congress the privilege of now prohibiting such national bank activity if that is its intent and desire.

In Parts IV and V of its opinion the Court outlines hazards that are present when a bank indulges in specified activities. The Court then states, in the last paragraph of Part V, that those hazards are not present when a bank undertakes to purchase stock for individual customers, or to commingle assets held in its several fiduciary capacities, and the like. I must disagree. It seems to me that exactly the same hazards are indeed present. A bank offers its fiduciary services in an atmosphere of vigorous competition. One need only observe the current and continuous advertising of claimed fiduciary skills to know that this is so and that the business is one for profit. In the fiduciary area a bank is engaged in direct competition with other investment concepts and with nonbanking fiduciaries. Failure or misadventure of a single trust may constitute a threat to public confidence among the bank's other trust beneficiaries, prospective trustors, and even the commercial activities of the bank itself. It has an inevitable adverse effect upon the bank's fulfillment of what is fashionably described today as its "full service."

Thus I feel that the Court overstates its case when it seeks to diminish the significance of these hazards in the fiduciary area as contrasted with mutual fund operation. After all, we deal here with something akin to the traditional banking function and with a device that makes available for the small investor what is already available for the large investor by way of the individual agency account.

What the Court decries in the investment fund is the combination of three banking operations, each concededly permissible: acting as agent for the customer, purchasing for that customer, and pooling assets. It is said that "the union of these powers" gives birth to something "of a different character" and is statutorily prohibited. I doubt that those three powers, each allowed by the controlling statutes, somehow operate in combination to produce something forbidden by those same controlling statutes, and I doubt that the unitization is something more than or something different from the mere sum of its parts and that it thereby expands to achieve offensiveness under the Glass-Steagall Act.

With my position as to the Act only a minority one, detailed discussion of the additional issue, raised in No. 59, as to the propriety of the exemption granted by the Securities and Exchange Commission, would be superfluous. Suffice it to say that I am in accord with the views expressed in the respective opinions on this issue in the Court of Appeals, 136 U. S. App. D. C. 241, 249–253, 266, 420 F. 2d 83, 91–95, and 108, and, in particular, by Chief Judge Bazelon when he carefully examined the four "danger zones" considered by the SEC and the protections erected against them, and then concurred in the Commission's exercise of judgment. I, too, feel that the Commission did not act arbitrarily or exceed its statutory authority and that its determination deserves support here.

I would affirm the judgments of the Court of Appeals.