**FLORIDA EAST COAST RAILWAY CO. et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 78–2188.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1980.

Fred R. Birkholz, Louisville, Ky., for petitioners.

Shirley A. Brantingham, St. Paul, Minn., for 13 Southern & Western Railroads.

James P. Tuite, I.C.C., Washington, D.C., Barry Grossman, Chief, Bruce E. Fein, Frederick W. Read, III, App. Sec., Antitrust Div., Dept. of Justice, Washington, D.C., for respondents.

R. Jeffrey Behm, Director, Federal Trade Comm., Washington, D.C., for amicus curiae.

Before GEE and RANDALL, Circuit Judges, and LYNNE *, District Judge.

GEE, Circuit Judge:

The Southern Ports Foreign Freight Committee ("SPFFC") petitions for review of an Interstate Commerce Commission ("ICC" or "Commission") order terminating the ICC's interim approval of the ratemaking agreement proposed by the SPFFC pursuant to section 5a of the Interstate Commerce Act, 49 U.S.C.A. § 10706 (1979) (amending 49 U.S.C. § 5b (1976)). Finding the SPFFC's contentions to be without merit, we enforce the ICC's order.

The peculiar nature of railroad ratemaking necessitates our taking a brief excursus into its history before discussing the particulars of the instant case. Since the 1890's, railroads have formed associations for the joint consideration and establishment of rates, classifications, and charges. *See United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 338, 17 S.Ct. 540, 557, 41 L.Ed. 1007 (1907). These organizations, called rate bureaus, serve primarily as a forum for the collective determination of rate matters. Because this manner of establishing rates brought rail carriers into conflict with the antitrust laws,[1] Congress in 1948 passed section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b (originally enacted as Act of June 17, 1948, ch. 491, 62 Stat. 472), extending antitrust immunity to

carriers with respect to collective ratemaking agreements approved by the ICC.[2]

In response to "changes in the competitive nature of the transportation market" in the course of the past century, *see* S.Rep., *supra* n. 2, at 11, most notably the diminished need for protection against rail monopoly, *id.,* Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 (the "RRRR Act"), Pub.L. 94–210, 90 Stat. 31 (codified at 45 U.S.C.A. § 801 et seq. (West 1979)), to further competition among railroads and otherwise modernize railroad ratemaking. The RRRR Act narrowed the antitrust exemption previously available to railroads in several respects, only one of which is relevant here. Before the RRRR Act was passed, any carrier who was a member of a rate bureau could participate in the bureau's rate determinations, *see* n. 2, *supra,* for an interline movement, regardless of whether it hauled goods along the route in question. Under the RRRR Act, only a carrier who can "practicably participate" in an interline movement is permitted to participate in agreements or rates related to that movement.[3]

To bring its agreement into line with the provisions of the RRRR Act, the SPFFC submitted a revised agreement [4] to the ICC. The revised agreement contained the following provision, addressing a carrier's ability to participate in proposals concerning

---

* District Judge of the Northern District of Alabama, sitting by designation.

1. See, e. g., *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 212–13, 60 S.Ct. 811, 839, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927).

2. See S.Rep. No. 49–499, 94th Cong., 2d Sess. 11, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 14, 28 (hereinafter S.Rep.).

   It may be useful here to outline briefly the general process of railroad ratemaking. A carrier or shipper files a proposed tariff with a rate bureau. The proposal is circulated to other members of the bureau, who vote on it. Once passed, the proposal is filed with the ICC. If approved by the Commission, the proposal establishes a rate for a specific route that every member railroad may charge. A member need not, however, participate in that rate; it may

submit a different rate to the members of the bureau for approval. In this fashion, the rights of every bureau member are guaranteed.

3. (3)(A) An organization established or continued under an agreement approved under this subsection shall make a final disposition of a rule or rate docketed with it by the 120th day after the proposal is docketed. Such an organization may not—
   (i) permit a rail carrier to participate in agreements related to, or to vote on single-line rates proposed by another rail carrier, or on rates related to a particular interline movement unless that rail carrier can practicably participate in that movement . . . .

   49 U.S.C.A. § 10706(a)(3)(A)(i).

4. The SPFFC's former agreement can be found at 284 I.C.C. 775 (1952).

the rates or charges applicable to an inter-line movement:

(b) In the case of a proposal to establish or change rates, allowances, or charges relating to any particular interline movement (called an "interline proposal" herein), only such carriers as can practicably participate in a movement involved in the proposal as an origin and/or destination carrier or as an intermediate carrier shall be eligible to vote or agree on such proposal. For purposes of this subparagraph, *a carrier can practicably participate in a movement involved in a proposal if such carrier participates in a route as published in a tariff on file with the Interstate Commerce Commission from an origin involved in the proposal to a destination involved in the proposal.*

(emphasis added). Objections to the SPFFC's definition of "practicably participate," italicized above, were filed with the Commission by the National Industrial Traffic League ("NITL") and the Federal Trade Commission ("FTC").[5] The NITL contended that the definition of the term "practicably participate," as used in section 10706(a)(3)(A)(i), should be restricted to those carriers who participate in the movement of the particular commodity involved in an interline movement. The FTC likewise protested that the SPFFC's proposed definition was too broad; however, it did not submit an alternative definition at that time. Despite this opposition, a division, or panel, of the ICC held that the SPFFC's definition provided "an adequate statement of the standards necessary for determination of the eligible member carriers authorized to consider collectively or vote on an interline proposal under the section [10706 (a)(3)(A)(i)]." Southern Ports Foreign Freight Committee—Agreement, 355 I.C.C. 216, 230 (1977).

The FTC appealed the division's ruling on this matter[6] to the full Commission, contending that the SPFFC's proposed definition would enable a carrier that was relatively disinterested in a particular interline movement to participate in setting rates for that movement. According to the FTC, a carrier could submit a "paper tariff," containing merely a "hypothetical alternate route," to the Commission for approval. Once that tariff was approved, the carrier could participate in rate determinations relating to that route even if it were unreasonable or had never been used. Additionally, the FTC raised the possibility that carriers who were relatively disinterested in a particular movement, but nonetheless eligible to vote, could trade a vote on that movement for favorable votes on movements in which they more actively participated. As a solution, the FTC proposed an alternative definition to determine when a carrier can "practicably participate" in an interline movement: whether the carrier currently participates in the movement or has participated in it within the preceding two years.

Convinced by the FTC's arguments, the full Commission agreed that the SPFFC's definition was too broad and adopted the FTC's definition with one modification not relevant here.[7] 358 I.C.C. 696 (1978). To support its conclusion, the ICC relied on the rule of construction that antitrust exemption statutes must be construed narrowly,[8] concluding that "[a] narrow construction of 'practicably participate' in this context favors competition and is, therefor, consonant with the objective sought by Congress in enacting the particular prohibition." *Id.* at 703. Accordingly, it reversed the division's decision and terminated the division's inter-

---

5. Other objections to the agreement, not relevant here, were also filed.

6. The SPFFC appealed various findings and conclusions of the division; however, they are not pertinent to this appeal.

7. Concerned that the FTC's definition would eliminate collective consideration by member carriers of proposals covering new traffic (*i. e.*,

traffic that has not moved by rail within the past two years) not previously handled by the rail carriers, the Commission extended the definition of "practicably participate" to permit those carriers who would handle the new traffic to vote on such proposals.

8. *See* Tidewater Coal Demurrage Agreement, 356 I.C.C. 66, 77–78 (1978).

im approval of the SPFFC agreement, subject to SPFFC's filing an amended agreement in conformity with the Commission's decision.

The SPFFC petitioned the ICC for a reconsideration. Although the ICC modified its decision on a provision not at issue here,[9] it affirmed its order in all respects relevant to the instant case. Southern Ports Foreign Freight Committee—Agreement (Aug. 29, 1978).

■ In its petition before this court, the SPFFC contends that we must deny enforcement to the Commission's order because it is not supported by substantial evidence in the record. The "substantial evidence" standard, however, pertains only to our review of *factual* determinations made by a government agency, not to matters of statutory construction. In reviewing the latter, we merely look to see if the agency's construction of the statute is reasonable: "It is settled that courts should give great weight to *any reasonable construction* of a regulatory statute adopted by the agency charged with the enforcement of that statute." *Investment Co. Institute v. Camp,* 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) (emphasis added). *Cf. Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (court owes "great deference" to the interpretation of the statute by the agency charged with its administration). In the instant case, it is clear beyond peradventure that the ICC, the agency charged with the enforcement of the RRRR Act, was engaged in interpreting the meaning of the term "practicably participate" as it appears in that statute. Consequently, we review the Commission's order only to ascertain whether or not its interpretation of the phrase "practicably participate" is reasonable.

■ We are persuaded by the record that the Commission's construction of the statute is both reasonable and in harmony with the intent of Congress in passing the RRRR Act. The Commission's definition comports with the economic realities of railroad ratemaking. Focusing as it does on *current* or *recent* participation in an interline movement, the Commission's definition effectuates the express legislative mandate that a railroad *actually* be able to participate in an interline movement before it is entitled to vote on rates affecting that movement:

> The second primary restriction in section 5(B) provides that where a rate, fare, allowance or charge is proposed to be applicable to a particular joint line movement, carriers which could not *practically participate* in that movement would not be permitted to participate in the consideration of the proposal. *Only those railroads which could actually handle the movement of traffic under the rate as an origin, destination, or intermediate carrier could join in the rate bureau proceedings relating to that rate.* Railroads which could not *practically participate* in a movement under the rate from origin to destination would be excluded from any bureau proceedings relating to that interline rate.

S.Rep., *supra* n. 2, at 55, U.S.Code Cong. & Admin.News 1976 at p. 69 (emphasis added).

The high degree of actual participation required by the Commission's definition is in sharp contrast to the lax standard embodied in the SPFFC's definition. Under the latter, a railroad need only file a tariff in order to participate. However, as the FTC points out in its brief, the "interconnecting nature of railroad rights-of-way permits virtually any railroad to construct a hypothetical route involving its own lines between any particular pair of origin and destination points." Thus, the SPFFC's definition would in effect permit any carrier who could *conceivably* handle a movement to participate in ratemaking relative to that movement. Given that Congress' primary purpose in passing the RRRR Act was to narrow the scope of the railroads' exemption from the operation of the antitrust laws, the SPFFC's interpretation renders the statutory provision at issue here completely ineffectual. Moreover, the

---

**9.** The Commission modified its prior findings to permit collective cancellation of obsolete interline rates.

SPFFC's definition leaves open an opportunity for collusive or other anticompetitive activities on the part of railroads that may be marginally, if at all, interested in a particular movement.[10] The definition adopted by the Commission eliminates that opportunity to a considerable extent.

Finally, contrary to what the SPFFC contends, the Commission's definition of "practicably participate" would *not* eliminate from ratemaking all carriers who use circuitous routes. If a carrier is using or has used a circuitous route for a particular movement within the preceding two years, it will be allowed to participate in the ratemaking negotiations concerning that movement. The ICC formulation will eliminate only those carriers with a hypothetical or, at best, tangential interest.

Given all of these circumstances, we harbor no doubt that the definition adopted by the Commission was not only reasonable but wise. Accordingly, the order of the Commission is

ENFORCED.

---

10. While there may not have been evidence presented that railroads do or would engage in vote trading, it is reasonable to consider the *possibility* that disinterested railroads might vote one way on a movement with which they are not directly involved in exchange for a favorable vote on a movement in which they actively participate.