MASTERS, MATES & PILOTS PENSION PLAN; Robert J. Lowen; James R. Hammer; F. Elwood Kyser; Ernest K. Swanson; Albert Groh; Allen Taylor; Edmond E. Davis, Franklin K. Riley; Edward Morgan; Herbert R. Ricklin; Larry J. Byers, Plaintiffs–Appellees,

v.

USX CORPORATION,
Defendant–Appellant,

v.

PENSION BENEFIT GUARANTY CORP., Amicus Curiae
(Two Cases).

MASTERS, MATES & PILOTS PENSION PLAN; Robert J. Lowen; James R. Hammer; F. Elwood Kyser; Ernest K. Swanson; Albert Groh; Allen Taylor; Edmond E. Davis, Franklin K. Riley; Edward Morgan; Herbert R. Ricklin; Larry J. Byers, Plaintiffs–Appellants,

v.

USX CORPORATION,
Defendant–Appellee,

v.

PENSION BENEFIT GUARANTY CORP., Amicus Curiae.

Nos. 89–2652, 89–2653 and 89–2664.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1989.

Decided April 9, 1990.

As Amended May 1, 1990.

---

James Theodore Carney, II (argued), Pittsburgh, Pa., for defendant-appellant.

Jeffrey Steven Endick (argued), Pepper, Hamilton & Scheetz, Washington, D.C. (Barry S. Slevin, Pepper, Hamilton & Scheetz, Jeffrey B. Cohen, Washington, D.C., of counsel), for plaintiffs-appellees.

Israel Goldowitz (argued), Sr. Counsel, Pension Benefit Guar. Corp., Washington, D.C. (Carol Conner Flowe, Gen. Counsel, Jeanne K. Beck, Deputy Gen. Counsel, Deborah Bisco, Pension Benefit Guar. Corp., of counsel), for amicus curiae.

Before HALL, MURNAGHAN and WILKINS, Circuit Judges.

MURNAGHAN, Circuit Judge:

USX Corporation and the *Masters, Mates & Pilots Pension Plan ("the Fund") (successor in interest to the Great Lakes & Rivers District and Maritime Pension Plan)* dispute the amount of liability incurred by USX when it sustained a partial withdrawal from the Fund. The dispute presents us with the need to consider three aspects of a multiemployer pension plan's calculation of a withdrawing corporation's liability under the Multiemployer Pension Plan Amendments Act of 1980: (1) the valuation of the plan's assets; (2) the determination of the plan's interest rate assumption; and (3) the making of a revision to the plan's original assessment of the withdrawing corporation's liability.

I.

The Fund, a multiemployer pension plan, covers the employees of USX (formerly U.S. Steel) who work on vessels operating on the Great Lakes and the Monongahela River. During the 1980's, the number of USX employees on those vessels dropped significantly, precipitating a decline in USX's contribution to the Fund. The decline was substantial enough to cause USX to sustain a partial withdrawal from the Fund, as defined by 29 U.S.C. § 1385.

On February 15, 1985, the Fund notified USX that it had sustained a partial withdrawal from the Fund as of December 31, 1984, and that USX's partial withdrawal liability was $434,559. On May 10, 1985, USX filed a request for review of the liability assessment, objecting to, among other things, the Fund's use of a moving market average to value its assets and its use of a 6.5% interest rate assumption. Although the Fund modified its assessment in response to some of USX's objections, the Fund refused to abandon either its valuation methodology or its interest rate assumption.

USX appealed the assessment to arbitration. Arbitrator Jack Clarke was selected to hear the matter and a hearing was scheduled for January 20 and 21, 1986. The hearing was later postponed, by agreement of the arbitrator and counsel, when the Fund indicated that it was revising the assessment.

On April 23, 1986, the Fund revised its earlier assessment, increasing it to $548,-996. The revision computed USX's liability as of a December 31, 1981, valuation date, rather than a December 31, 1982, valuation date, which had been used in the original demand.

The arbitrator, after hearing the case in January 1987, required the Fund to make two changes to its assessment. First, he decided that the Fund must use the assessment that it had originally calculated because the Fund delayed too long in issuing a revision. Second, he decided that the Fund's use of the moving market average for valuation purposes was unreasonable. The arbitrator did affirm the Fund's use of the 6.5% interest rate assumption.

The United States District Court for the District of Maryland enforced the arbitrator's award but overturned the arbitrator's decision that the use of the moving market average was unreasonable. Both parties have appealed from the district court's decision.

USX argues first that the district court should not have reversed the arbitrator's decision that the Fund's use of the moving market average was unreasonable and second that neither the district court nor the arbitrator should have considered the Fund's 6.5% interest rate assumption reasonable. The Fund opposes both of USX's arguments and further contends that the district court should have reversed the arbitrator's refusal to consider its revision of the assessment.

## II.

■ Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. No. 96–364, 94 Stat. 1221 (1980) (codified into ERISA at 29 U.S.C. §§ 1381–1461), to protect the financial base of pension plans from the erosion that occurred when a participating employer withdrew from a multiemployer pension plan that contained unfunded vested benefits ("UVBs").[1] See H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 60, reprinted in 1980 U.S.Code Cong. & Admin.News 2918, 2928. Prior to MPPAA, an employer's withdrawal from a multiemployer plan burdened the remaining contributing employers with an increased contribution rate—a larger share of the UVBs had to be covered by each remaining employer. As the cost of participating in the plan and covering the UVBs increased for each remaining employer, the incentive for the remaining employers to leave the plan was heightened.

MPPAA establishes liability for complete and partial withdrawals so that an employer who withdraws from a pension plan pays its proportionate share of the plan's UVBs. See 29 U.S.C. § 1381 (1982). The amount of a withdrawing employer's liability is initially assessed by the plan sponsor, here the Fund. Id. § 1399(b)(1). Within ninety days after receiving the assessment, the employer may request the plan sponsor to review the determination of liability. Id. § 1399(b)(2)(A). After a "reasonable review of any matter raised," the plan sponsor must notify the employer of its decision. Id. § 1399(b)(2)(B); see Robbins v. Lady Baltimore Foods, Inc., 868 F.2d 258, 261 (7th Cir.1989) (explaining MPPAA scheme in detail). In the event of a dispute, the employer may then initiate arbitration. 29 U.S.C. § 1401(a).

## III.

■ When computing an employer's withdrawal liability, a plan sponsor must compute the value of the plan's assets. The employer is assessed a proportionate share of the UVBs (the amount by which the value of vested benefits exceeds the value of the plan's assets). The lesser the

1. The amount of UVBs is the amount by which the value of future benefits vested (nonforfeit- able) in covered employees exceeds the value of the plan's assets. 29 U.S.C. § 1393(c) (1982).

value of the plan's assets, the more that a withdrawing employer will get charged.

USX contends that the value of the Fund's assets, calculated by way of a moving market average ("MMA"), is fictitious. The Fund's use of MMA resulted in an increase in the assessment against USX of almost $200,000, or 75% more than what would have been assessed if the Fund had used current market value to value its assets.[2]

MMA values plan assets by computing the average market value of those assets over a certain time period. The Fund here used a five-year MMA. Thus, instead of using the current market value as the true value of its assets, the Fund valued its assets by using the average value of those assets over the past five years, with each year's market value equally weighted in the computation.[3] A five-year MMA is a conservative approach to asset valuation, as it takes account of changes in asset value at the rate of 20% per year; in other words, an increase or decrease in the Fund's assets will only be fully incorporated into the valuation after five years. Thus, the MMA approach moderates the impact of severe fluctuations in the stock market.

The arbitrator held that the Fund's use of MMA was unreasonable as applied to the computation of an employer's withdrawal liability. He stated that using MMA when determining an employer's proportionate share of UVBs shifts the burden of paying the UVB expense from one employer to another, except in the rare instance when the MMA value and the market value are the same. He reasoned that if the MMA undervalues the assets then a withdrawing employer will get charged a higher assessment without ever making it

up later as he is withdrawing from the plan. He essentially concluded that the MMA is unreasonable *per se* to compute withdrawal liability assessments.

The district court reversed the decision of the arbitrator. The court noted that the record established that there was a genuine difference of opinion among actuaries regarding whether MMA provides a sounder basis for valuation. In light of such a difference of opinion, the district court concluded that ERISA's presumption of the Fund's actuarial correctness applied. *See* 29 U.S.C. § 1401(a)(3)(B)(i). It also noted that the arbitrator did not make a finding that MMA caused a substantial undervaluation under the particular circumstances. The court enforced the arbitrator's award and ordered that the assessment be calculated according to the MMA value as initially used by the Fund rather than the current market value of the assets.

■ The Fund argues for affirmance of the district court's conclusion that the use of MMA is reasonable, however its primary argument rests on different grounds. The Fund contends that an inquiry into the reasonableness of an actuarial assumption for withdrawal liability purposes should not be undertaken if that actuarial assumption is reasonable for funding purposes.

■ The Fund constructs the following statutory argument to show why such is the case: (1) 29 U.S.C. § 1393(b) states that when determining an employer's withdrawal liability, "the plan actuary may [ ] rely on the most recent complete actuarial valuation used for purposes of Section 412 of Title 26"; and (2) 26 U.S.C. § 412 provides that, for purposes of determining funding requirements, the actuary may use reason-

---

2. The difference between using MMA and using current market value to value the Fund's assets is as follows:

| | Using Market Value | Using MMA |
|---|---|---|
| Value of the Fund's Assets | $3,671,000 | $3,234,000 |
| UVBs | $582,800 | $1,020,200 |
| USX's Assessment | $248,300 | $434,559 |

3. For example, using a five-year MMA the following market values would yield an asset value of $1,200:

| | | |
|---|---|---|
| Year 1 | — | $1,000 |
| Year 2 | — | $1,000 |
| Year 3 | — | $1,000 |
| Year 4 | — | $1,000 |
| Year 5 | — | $2,000 |
| Total | — | $6,000 |
| Average | | $1,200 |

able assumptions. Thus, the Fund concludes, a plan is entitled to use reasonable funding assumptions in the computation of withdrawal liability and if an assumption is reasonable for funding purposes, it must also be reasonable for withdrawal liability purposes. The Pension Benefit Guaranty Corporation ("PBGC"), as *amicus curiae*, agrees with the Fund, arguing that reasonable funding assumptions should be presumed, without any separate inquiry, to be reasonable for withdrawal liability purposes.[4]

While that conclusion is arguably supported by some statutory language, its acceptance would contravene other direct statutory language as well as logic. 29 U.S.C. § 1393 states:

> Withdrawal liability under this part shall be determined by each plan on the basis of [ ] actuarial assumptions and methods which, in the aggregate, are *reasonable* (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan. . . .

*Id.* § 1393(a) (emphasis added). Furthermore, § 1401(a)(3)(B)(i) states that actuarial assumptions will be presumed correct unless the employer shows that "the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable." The statute cannot be read to authorize actuarial assumptions that, in the aggregate, are *unreasonable* as applied to withdrawal liability calculations, even if those same assumptions are reasonable when used for funding purposes. We therefore reject the argument that the Fund's use of MMA here must be presumed reasonable. *See Trustees of the Pressman Local 72 Indus. Pension Fund v. Judd & Detweiler, Inc.*, Civil No. JFM–88–562, Slip Op. at 4–8 (D.Md. Dec. 21, 1988) (after consideration of MPPAA's legislative history, the court rejects the argument that reasonable funding assumptions should be presumed reasonable in the withdrawal liability context).

■ Nevertheless, the district court was correct in overruling the arbitrator's decision that the use of MMA was unreasonable *per se*. Whether one thinks that MMA asset values are accurate or "fictitious" necessarily depends upon the particular economic theory of valuation that one accepts. Adherents to the Efficient Markets Hypothesis consider current market value to be the most accurate measure of asset value. *See, e.g.,* H. Levy & M. Sarnat, *Portfolio And Investment Selection: Theory and Practice* 665–87 (1984); R. Hagin, *Modern Portfolio Theory* 91 (1979). However, other theorists believe that market value is dependent upon psychological factors, and therefore current market values sometimes are only "castles in the air" and offer a distorted picture of real asset values. *See, e.g.,* G. Clairmont & K. Sokoloff, *Street Smart Investing* 85 (1984); B. Malkiel, *A Random Walk Down Wall Street* 25–27 (1981) (discussing J.M. Keynes, *The General Theory of Employment, Interest and Money* (1936)). Such theorists would be hesitant to rely solely on current market values for valuation purposes and might instead prefer a moving market average approach.

---

**4.** The Pension Benefit Guaranty Corporation is a wholly-owned United States government corporation established by the Employee Retirement Income Security Act of 1974. The PBGC, participating as *amicus curiae*, contends that its views, as the agency charged with implementing the statutory scheme at issue, are entitled to considerable deference. *See Nachman Corp. v. PBGC*, 446 U.S. 359, 373–74, 100 S.Ct. 1723, 1732–33, 64 L.Ed.2d 354 (1980) (deference afforded to PBGC regulation). But while the views of an agency as expressed in its rulings, regulations, and administrative practice are generally entitled to deference, the views of an agency's appellate counsel, unsupported by official agency pronouncements, are not afforded deference. The Supreme Court has stated that no deference is given "to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988) (citing *Investment Company Institute v. Camp*, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971)). Nevertheless, the PBGC, with their *amicus curiae* brief, has provided us with a sextant, enabling us to navigate our journey into uncharted, treacherous seas. *See Mead Corp. v. Tilley*, —— U.S. ——, 109 S.Ct. 2156, 2164, 104 L.Ed.2d 796 (1989).

We cannot discern the approval of only one theory of valuation in the statutory scheme. Neither can we espouse one particular economic theory over another. *Cf. Lochner v. New York*, 198 U.S. 45, 75–76, 25 S.Ct. 539, 546–47, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). We, therefore, must conclude that the use of MMA is not *per se* unreasonable. The amelioration of fluctuations, which may be distorting as to value over a short period of time, is one MMA characteristic that should not be ignored, especially when the value selected will have an impact over a substantial period of time.[5]

■ MPPAA provides that a fund's determination of UVBs is presumed correct unless the employer shows by a preponderance of the evidence that "the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable." 29 U.S.C. § 1401(a)(3)(B)(i). After a review of the record in the present case, we affirm the district court's conclusion that USX failed to point to evidence that the Fund's use of MMA was an unreasonable actuarial method or caused a substantial undervaluation of the Fund's assets.

### IV.

■ In computing an employer's withdrawal liability, a plan sponsor must calculate the present value of the vested benefits that are to be paid out in the future. An interest rate, or rate of return, is applied in order to determine what present amount of investment will yield the future amounts required to satisfy those vested benefits. In other words, the future benefits are "discounted" to present value. The higher the assumed rate of return, then the less present investment is needed to pay out the future benefits. After the present value of the vested benefits is determined, the asset value of the plan is deducted to come up with the amount of unfunded vested benefits, of which a withdrawing employer is assessed a share. Thus, a higher interest rate applied to discount future ben-

efits will result in a lesser amount of withdrawal liability for the employer.

■ The Fund, in this case, applied an interest rate of 6.5%, the rate it has used since 1977 for both funding and withdrawal liability purposes. The arbitrator determined that the employer failed to introduce sufficient evidence to demonstrate that 6.5% was unreasonably low. He noted not only that the Fund naturally sought a conservative estimate to ensure that it would be adequately funded, but also that the interest rate assumption was used to discount future payments for, at least, the next twenty years. In light of those considerations, the arbitrator concluded that the 6.5% estimate was reasonable. The district court affirmed the arbitrator's conclusion.

USX appeals the order contending that the district court erred by not reversing the arbitrator, particularly when considering that the arbitrator was presented with the following evidence: (1) recent experience of the Fund indicated an average rate of over 10%; and (2) the return available from investments in United States Treasury securities exceeded 10%, and was high enough to pay all of the future benefits.

USX, however, is faced with two statutory presumptions. 29 U.S.C. § 1401(a)(3) provides that in determining a plan's unfunded vested benefits, the plan's determination is presumed correct unless an employer shows by a preponderance of the evidence that the actuarial assumptions were, in the aggregate, unreasonable. Section 1401 also provides that an arbitrator's findings of fact are presumed correct and rebuttable only by a "clear preponderance of the evidence." *Id.* § 1401(c).

Neither point made by USX, in our view, suffices to rebut the arbitrator's conclusion that the Fund's use of the 6.5% interest rate was reasonable. First, the Fund's showing of a 10.1% average from 1978 to 1984 is not dispositive when considering that the Fund's projection encompasses, at

---

5. Of course, the use of MMA is not *per se* reasonable. For example, a 100–year moving market average, which only incorporates 1% of the change in current market value per year, might well be unreasonable.

least, twenty future years. Indeed, the Fund's rate of return from 1977 to 1981 averaged 4.34%, in 1978 was 4.53%, and in 1979 was 6.27%.

Second, USX's showing that the Fund could have invested its assets so as to ensure payment of all future benefits does nothing more than show that the current risk-free rate of return was around 10%. That is, an investor could have purchased a Treasury Bond portfolio earning over 10% with almost no risk—the issuer, the government, has the power to tax and therefore is considered to offer a risk-free investment.

However, most institutional investors do not invest only in government securities and accept a risk-free return. Rather, an investor will try to earn a higher return, but to do so will have to accept a portfolio with at least some risk. Thus, a rational investor might earn more than the risk-free rate but might also earn less.[6] The current level of the risk-free rate might be relevant in determining what range of interest rates will likely be earned within a certain time frame; but its existence cannot be considered a floor for valuing benefits, or else, pension plans would be forced to invest in only government securities since they could not chance holding a riskier portfolio and producing less than the riskless rate of return. Investing's customary component of prudent risk taking is nowhere outlawed in the relevant statutory provisions.

The Sixth Circuit has reached a similar result. In *Bd. of Trustees, Mich. United Food & Comm'l Workers Union v. Eberhard Foods, Inc.*, 831 F.2d 1258 (6th Cir. 1987), a withdrawing employer contested the Fund's liability assessment by complaining that the use of a 6% interest rate assumption was unreasonable. The arbitrator had upheld the fund's calculation and the district court had enforced the arbitrator's award. Recognizing the applicabil-

ity of the statutory presumptions, the Sixth Circuit held that the employer's showing was insufficient to establish that the 6% rate was "unreasonable." *Id.* at 1263. The rate was consistent with historical interest rates over a long period of time. The court also rejected the employer's assertion that a government-security portfolio would do better: "[T]he statutory scheme contemplates that the actuary will be determining an interest rate based on the unique characteristics of the plan—not dictating the future investment portfolio of the plan." *Id.*

## V.

On April 23, more than one year after the Fund originally issued the liability assessment to USX, it revised the assessment. The arbitrator refused to consider the merits behind the Fund's revision; rather, the arbitrator concluded that the Fund was precluded from revising its original assessment because the revision did not come within a "reasonable" amount of time after withdrawal. In his written opinion, the arbitrator emphasized the following sequence of events:

2/15/85 — Initial Demand By the Fund
5/10/85 — Response by USX
6/20/85 — Detailed Response by USX
8/09/85 — Fund's Reply
8/19/85 — USX Invokes Arbitration
4/23/86 — Fund's Revision of Assessment

Because the revision was issued 10 months after USX's responses to the original assessment and 8 months after the Fund's reply, the arbitrator concluded that, in the interests of fairness to USX and the orderly determination of liability, the Fund's revision was unreasonably delayed.

■ The district court affirmed the arbitrator's refusal to consider the merits of the revision. The court interpreted the statute to require that assessments be made within a reasonable period of time and considered the arbitrator's decision of

---

**6.** The Capital Asset Pricing Model posits that the expected rate of return of a given stock portfolio is equal to the risk-free rate of return, as earned on government securities, plus a premium for the amount of systematic (nondiversifiable) risk contained in a portfolio. R. Radcliffe, *Investment: Concepts, Analysis and Strategy* 175

(1982). Of course, risk in a portfolio means that, in certain periods, the portfolio's return could be less than the risk-free rate. B. Malkiel, *supra*, at 204–06. Nearly all securities, save federal government debt securities, contain a certain degree of risk. R. Hagin, *supra*, at 334.

*unreasonable delay* in making the revision to be supported by sufficient evidence. We reverse the district court and hold that a plan's revision to a withdrawal liability assessment may only be refused by an arbitrator if the employee makes a showing of prejudice.

The Fund principally argues that the statute permits revisions to assessments unless prejudice to the employer can be demonstrated.[7] Throughout its argument, the Fund recites the purpose of the MPPAA as the accurate collection of liabilities from participating employers. Thus, if a rule was created that formalistically precluded modifications to calculations, the statutory purpose of "accurate assessments" would not be served. The PBGC agrees, contending that since the arbitrator's hearing is a plenary evidentiary hearing, the most appropriate analogy is the civil litigation process. In the civil litigation process, the PBGC argues, leave to amend under Federal Rule of Civil Procedure 15 is freely granted prior to the commencement of trial; hence, the same leave should be afforded to pension plans.

The statute simply does not address whether revisions to withdrawal liability assessments must be made by plan sponsors within a certain period of time, even in the absence of prejudice to the employer. Section 1399 requires that the original assessment be made "[a]s soon as practica-

ble" after withdrawal. 29 U.S.C. § 1399(b)(1). Once an employer asks the plan to review the assessment, the statute also requires the plan to notify the employer of the decision "after a reasonable review of any matter raised." *Id.* § 1399(b)(2)(B). But the statute is silent as to the ability of a plan to cure errors in the original assessment once the employer has invoked arbitration.

 In the present case, it appears that USX would suffer no prejudice from the Fund's revised assessment. The correctness of the revision and the error in the original assessment are not in dispute. Indeed, by agreement of counsel, the arbitrator's hearing was postponed and USX had nearly nine months between receiving notice of the Fund's revision and the rescheduled hearing date. Frankly, it is hard to conceive of any possible prejudice in this case.

We are here asked to balance MPPAA's policy goal of the accurate collection of withdrawal liability against the interests of the orderly administration of justice,[8] the latter concern being implicated if a plan's ability belatedly to amend its assessment interferes with the arbitrator's capacity to resolve the dispute in an efficient manner.

We come out in favor of promoting one of the motivating purposes behind MPPAA—requiring withdrawing employ-

---

7. The Fund also argues that, in light of the relevant authorities, its revision was not unreasonably delayed. Although the Fund does cite cases in which courts have allowed assessments three or four years after withdrawal, those cases deal with the permissible interval between the occurrence of the employer's withdrawal and the original assessment. They do not deal with the timeliness of a revision to an assessment that has already been received by the employer.

The PBGC contends that since it would not have been unreasonable for the Fund to issue its original assessment in April 1986, it could not have been unreasonable for the Fund to revise the assessment in April 1986. However, as in any dispute resolution process, there is a significant difference between (1) the permissible time frame to issue an assessment, and (2) the permissible time frame to revise an assessment that has already been issued. The fact that a limitations period exists for the making of the original assessment does not imply that a Fund, after initiating the assessment process, can change

the complaint at any point within that time frame. For purposes of our analysis, we assume without deciding that the Fund's revision did not come within a reasonable amount of time.

8. In the absence of specific prejudice to the employer, the policy interests of fairness to the employer are not implicated. It might, however, be argued that general unfairness will result if plan sponsors are allowed to make revisions to the assessment at any time prior to the hearing while an employer is forced to object to any inaccuracies within ninety days. *See* 29 U.S.C. § 1399(b)(2)(A); *id.* § 1401(b).

But a distinction exists between an employer's ability to invoke MPPAA's dispute resolution process and an employer's ability to raise specific objections once that process has been invoked. We do not hold—nor have we considered—that an employer does not have a right, similar to the Fund's right here, to amend its objections prior to the arbitration hearing.

ers to pay their proportional share of the plan's unfunded benefit obligations so as to relieve the funding burden on remaining employers. *See* H.R.Rep. No. 869, 96th Cong., 2d Sess. 67, *reprinted in* 1980 U.S. Code Cong. & Admin.News 2918, 2935. As in civil litigation, new information relevant to the determination of the employer's liability may come to light during the MPPAA review process. *See* 29 C.F.R. § 2641.4(a)(2) (1989) (withdrawal liability arbitrator may allow any party to conduct discovery). In the absence of prejudice on behalf of the employer and bad-faith on behalf of the Fund, the cost of considering such information is the disruption and confusion it might cause the dispute resolution process. That concern can be mitigated, as was done here, by postponing the arbitration hearing if necessary. The benefit of allowing good faith revisions to liability assessments is the move toward a more accurate assessment of the withdrawing employer's obligations to a multiemployer pension plan. Given the goals behind the enactment of the statute, we consider the choice to be a clear one—accuracy must prevail in the absence of prejudice.

█ Absent prejudice to the opposing party, the mere fact that a revision is offered late in the arbitration process is not enough to bar it. *Cf. Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1044 (4th Cir.1984) (same standard for leave to amend under Rule 15 of the Federal Rules of Civil Procedure); *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (leave should not be denied unless bad faith on the part of the movant). Thus, the arbitrator's refusal to allow the Fund's revision to the assessment, in the absence of a showing either of prejudice to USX or of bad faith on behalf of the Fund, was an abuse of discretion. Accordingly, we reverse the decision of the district court and remand for proceedings consistent with the letter of our opinion.

REVERSED AND REMANDED.