**Lawrence S. MYERS and wife Nella S. Myers, Plaintiffs,**

v.

**THE HEXAGON CO., L.L.C. d/b/a Rick McGill's Airport Toyota, Defendant.**

No. 3:97–CV–725.

United States District Court, E.D. Tennessee.

Aug. 3, 1998.

Sandra Gevedon Olive, Olive & Olive, PC, Knoxville, TN, for plaintiffs.

Ellis A Sharp, Stokes & Fansler & Williams, Knoxville, TN, Michael D Hester, Becker, Thomforde, Brown & Knight, PC, Knoxville, TN, for The Hexagon Co., L.L.C., dba Rick McGill's Airport Toyota, defendant.

## MEMORANDUM OPINION

MURRIAN, United States Magistrate Judge.

This case is before the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73(b), Federal Rules of Civil Procedure, for all further proceedings, including entry of judgment [*see* Doc. 8]. This matter was tried without a jury before the undersigned on July 14 and 15, 1998. Appearing on behalf of the plaintiffs, Lawrence S. and Nella S. Myers, was Sandra G. Olive, Esq. Appearing on behalf of the defendant, The Hexagon Co., L.L.C. d/b/a Rick McGill's Airport Toyota (hereinafter referred to as "McGill's"), was Michael D. Hester, Esq.

This is an action to recover damages for alleged violations of the Tennessee Consumer Protection Act, T.C.A. § 47–18–101 *et seq.*, and the Consumer Leasing Act, 15 U.S.C. § 1667a. The plaintiffs claim that they entered into a lease of a 1997 Toyota Camry from McGill's in March 1997; that they traded in a 1995 Toyota Camry which they believed would result in a $7,000 credit on the cost of the new lease vehicle, due to oral negotiations and terms of a formal promotion being conducted by McGill's at the time the lease was entered into; that McGill's failed to give them any credit at all for their trade-in on the lease; that McGill's sold the trade-in to a third party the day after the lease was entered into for a substantial profit; that McGill's fraudulently increased the cost of the lease by adding an extended warranty charge which was never actually purchased nor needed by plaintiff; that certain other costs were included in the transaction that were not disclosed to plaintiffs, including an inflated cost of the transferring tags from the trade-in vehicle to the new lease vehicle and adding $595 to the cost of the lease that was charged by the assignee of the lease from McGill's; that none of the above items and charges therefore were included on the contract or on any other document; that this fact and the failure to list the trade-in value of the 1995 Toyota as a reduction of the initial lease value on the contract were violations of certain provisions of the Federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and related regulations; that these violations of federal law also constitute violations of the Tennessee Consumer Protection Act, T.C.A. § 47–18–101, and in addition constitute common law fraud under Tennessee law; and that the actions of McGill's resulted in actual damages to plaintiffs in that they were charged an inflated lease cost (capitalized cost), higher monthly payments, and a higher residual for the vehicle at lease end throughout the three year term of the lease [*see* Doc. 19]. The plaintiffs seek actual damages plus statutory penalties for the alleged violation of federal law and either treble damages or punitive damages for alleged violations of Tennessee law. Plaintiffs also seek injunctive relief, enjoining the defendant from taking automobiles in trade on leases without giving the lessees credit for their trade-in [*id.*].

The defendant does not dispute that on or about March 27, 1997, the plaintiffs entered into a lease of a 1997 Toyota Cam-

ry from McGill's; that at the time of the lease, plaintiffs traded in a 1995 Toyota Camry, on which there existed a lien of approximately $11,000; and that the lien was paid off by defendant as part of the lease agreement with the plaintiffs. The defendant also admits that the plaintiffs received no credit on the lease for the trade-in of the 1995 Camry. The defendant disputes, however, that it either expressly or impliedly offered to pay the plaintiffs for the 1995 Toyota Camry such an amount as would entitle them to approximately $7,000 in equity; or that it either expressly or impliedly represented to plaintiffs that any such equity would be applied as a credit toward the costs of the leased 1997 Toyota Camry. Defendant contends that plaintiffs were presented with the original lease agreement and were given every opportunity to review the agreement before signing it; that it did not fraudulently increase the cost of the lease or wrongfully inflate and or include costs in the subject transaction; that it has complied with all applicable federal and state laws then existing; that plaintiff is not entitled to an award of actual, statutory, treble, or punitive damages; and that plaintiffs are not entitled to injunctive relief [Doc. 19].

Mrs. Nella Myers testified that she is 66 years old; that she has a high school education; that she worked for the FBI, the Department of the Navy, the Coast Guard, and the Civil Service Commission; and that she is now retired. She further testified that neither she nor her husband had any experience leasing a vehicle; that they owned a 1995 Toyota Camry that they bought in Texas; that they traded a vehicle in on the '95 Camry and got a trade-in allowance; that she and her husband were going to California and wanted a V-6 engine as opposed to a V-4 because they knew the V-4 would not do well in the mountains; and that they had received a promotional flyer in the mail from the defendant. Mr. Lawrence Myers testified that the flyer offered 20% above book value on a trade-in and it looked like a good opportunity for them to upgrade their car. Ms. Myers testified that her daughter had a 1988 Toyota Cressida and she and her husband decided to see what kind of appraisal would be offered on the Cressida; that they met with Tim McCall, one of defendant's salesmen, who took them for a test drive in a 1997 Camry; that when they got back to the showroom, Mr. McCall said that he needed help as it was his first day on the job; that Mr. Serio came to assist Mr. McCall; that she does not remember what was offered on the Cressida, but that the offer was oral; that her husband did not agree with what was offered on the Cressida, so they took the Cressida home and returned with the '95 Camry; that Mr. Serio told them to drive the '97 Camry home to pick up the other car; that it was probably after 8:00 P.M. when they returned to the dealership; that when they returned, they had made the decision that they were going to purchase the '97 Camry; that they left their car in front of the showroom and went into a cubicle with Mr. McCall; that they were waiting for the '95 Camry to be appraised; that Mr. Serio brought up leases; that a man that she never actually saw came to the cubicle and said "how about $18,000;" that her husband said they would take it; that she remembers the figure offered because she and her husband were very happy and excited since they had been offered exactly what they wanted; that they went to McGill's with the idea that 20% above book value would yield them $18,000 on their '95 Camry; that no one ever put anything in writing regarding the terms of the lease; that they filled out the credit application [Plaintiff's Exhibit 3] when they decided to lease the car; that her husband told McCall and Serio to keep the monthly payment under $400; that after they decided to lease the '97 Camry, they went into Ms. Davis' office (the Finance and Insurance Manager); that they were never told that they needed to put any money down on the lease; that her understanding of the agreement was that they

were trading in their '95 Camry for the '97 Camry; and that defendant was giving them $18,000 for the '95 Camry; that no other figure was ever discussed; that no one said that they would receive less than $18,000 due to a leasing arrangement; that she thought their equity had been taken into account in figuring their monthly payment; that she signed the Toyota Auto Care Application [Plaintiff's Exhibit 18] because her husband had gone to the restroom; that she does not recall the agreement purchase price of $595 being on the document when she signed it; that Ms. Davis told them that she was "throwing this in;" that regarding the Lease Agreement [Plaintiff's Exhibit 8], her husband asked Ms. Davis what the initials "N.A." meant; that Ms. Davis stated that there was no need for figures to be on there, that it did not mean anything, and that it would be taken care of later; that they were in Ms. Davis' office for about one hour; that Ms. Davis put papers in an envelope for the Myers to take with them; that they left the defendant's business about 9:00 P.M. and stopped for dinner on the way home; that her husband looked at the papers when they got home and realized that they did not have a copy of the lease agreement; that her husband called Ms. Davis the next day and requested a copy of the lease; that Ms. Davis said that she would mail it; that it did not come in the mail so they went to the dealership to pick it up; that she brought something out in a plain white envelope, but that it was not the lease agreement; that they obtained an appointment with Jay Hill, the general sales manager at McGill's; that they had a pleasant meeting and he said that he would see that they got the papers they requested; that they requested an accounting of their equity in the '95 Camry—how did the $7,000 figure into the lease; that they were sent more documents, but that these documents consisted of two copies of their credit application; that her husband was becoming suspicious; that they went back to McGill's and looked at other cars in an attempt to figure out what their '95 Camry was worth; that Mr. Hill gave her husband a check for $500 for "good faith;" that the conversation turned to talk of lawyers; and that they are satisfied with the car and only wanted an accounting of their $7,000 in equity.

Mr. Myers testified that he is 77 years old; that he is twice retired from the United States Navy after 25 years and the Department of Defense; that he had never leased a car before; that after they received McGill's promotional offer in the mail he called his credit union and obtained trade-in values on the '88 Cressida and the '95 Camry; that he took this information with him first to Toyota of Knoxville and then to McGill's; that the book value of the Cressida was $5,000; that when they got to McGill's they were approached by Tim McCall; that they told him they were interested in purchasing a '97 Camry; that McGill's offered them $5,000 for the Cressida; that since the credit union told him that the trade-in value of the Cressida was $5,000 he was expecting about a $6,000 offer from McGill's with the 20% above book value offer; that he ignored the $5,000 offer and told McCall that he was going to go get the '95 Camry; that he drove the '97 Camry home while his wife drove the Cressida; that they had lunch, switched cars and returned to McGill's; that the '95 Camry they were trading in had never been wrecked, had been maintained well, and had 31,130 miles on it; that when they returned to McGill's they had already made up their minds that they wanted to purchase the '97 Camry; that they were certain enough that he started transferring their belongings from the '95 Camry to the '97; that the appraiser took the car while they were in the showroom; that either Mr. Serio or Mr. McCall brought up leasing; that they ultimately decided to lease before they got an appraisal of the '95 Camry; that they then started negotiating a lease payment; that Messrs. Serio and McCall asked what payment he wanted and he responded less than $400

per month; that the appraiser said "how about $18,000" and Mr. Myers stated that that was "about right" as he'd gotten a book value from the credit union of about $15,000; that from that point he assumed they had a deal and that the $18,000 offer would be honored; that there was no discussion of how the trade-in would be handled; that Mr. Serio wrote the figure of $369 on a calendar blotter and Mr. Myers said that was fine; that no other figures were discussed; that he would not have agreed to an offer of nothing more than the payoff value on the '95 Camry; that they owed a little over $11,000 on the '95 Camry; that before they saw Ms. Davis, they had agreed to a trade-in of $18,000 and he and his wife assumed that they would get credit for the $18,000 in whatever deal they reached; that he made no down payment; that he understood that any down payment would come out of the equity in the '95 Camry; that when he spotted the "N.A.s" in block 16[1] on the lease agreement he asked questions; that he knew there had been a trade-in and should have been some sort of value in there; and that Ms. Davis said that this was not needed on the lease agreement. Despite the fact that block 16 on the lease agreement states that $464.21 was due at the lease signing, Mr. Myers testified that he did not pay this amount and assumed that it came out of the equity; that they left Ms. Davis' office about 9:00 P.M.; that Ms. Davis put documents in an envelope for the Myers to take with them; that he examined the documents about 11:00 P.M. and realized that he could not tell what trade-in value they had received; that he called Ms. Davis the next day (Friday) and she said she would put the lease agreement in the mail; that he had not received it by Tuesday, April 1, 1997, so he and his wife went to see Davis; that she gave them an unsealed and unstamped enveloped with the lease agreement inside; that he glanced at the document and told her

that there was nothing on there that showed how the $7,000 was used; that Ms. Davis had no response; that he left the dealership in a huff; that the next day he called and spoke with Rick McGill; that Mr. McGill referred him to Jay Hill; that he and Mr. Hill agreed to meet on April 5, 1997; that at the meeting, he told Mr. Hill that he wanted an accounting of his $7,000 equity; that Mr. Hill told him that he could not give him the figures exactly; that Mr. Hill had a bunch of documents in his lap, but never told him how the equity was used; that Mr. Hill said that he would send some documents in the mail; that he did receive an unsigned copy of the lease agreement and two copies of their credit application; and that he and his wife instituted this suit because McGill's never gave them an explanation of what happened to their equity.

Mr. Tim McCall, the salesman who worked with the plaintiffs, testified at trial that the day he assisted the Myers was his first day on the job; that he is currently employed by the Sevierville Police Department; that he was encouraged to suggest leasing; that leasing was 60–70% of the defendant's business; that he did not have a lot of lease training; that he was to mention the lease plan and if a customer was interested, get a sales or floor manager to assist him; that the typical procedure if someone is interested in a car is to have an appraisal; that the appraisers were any of the sales managers and sometimes floor managers or other experienced persons; that Jay Hill was the general sales manager; that he does not recall who appraised the plaintiff's '95 Camry; that he had no idea how to handle equity on a trade-in; that once a vehicle is appraised, the first step of negotiation is to find out the customer's goal—i.e., the monthly payment; that once a vehicle is appraised, the manager would put figures down and he would take it to the customer to see what they

---

**1.** Block 16 on the lease agreement sets forth the amounts due at the signing of the lease.

Plaintiff's Exhibit 8.

could do; that typically, negotiations are written on the bottom of the form titled "Offer to Lease/Purchase" [Plaintiff's Exhibit 5]; that he does not know why the bottom of the plaintiff's "Offer to Lease/Purchase" form is blank; that his memory of the day the plaintiff's came in is vague; that it was a busy and stressful day; that he believes he mentioned a lease to the plaintiff's and that when Mr. Serio was negotiating with the plaintiffs they asked to hear more about it; that there was a promotion going on because Mr. Serio was associated with promotions; that he does not recall the terms of the promotion; that he knows that the '95 Camry had to have been appraised because it was traded in; that when someone is interested in purchasing a car, that is one of the first steps; that he just does not recall the details of the appraisal; that in a lease deal he learned that equity could be used as money down to reduce the payments or the customer could receive money back; that he completed the "Retail Buyers Order" [Plaintiff's Exhibit 4]; that the fact that "Trade-in Allowance" and "Not Trade-in Allowance" are blank does not mean that the plaintiff's were to get none; that he does not remember the plaintiffs bargaining on the basis of the equity in their trade-in vehicle; that if a customer does not ask about equity over and above the pay off amount, it was not his duty to tell them; that once a vehicle was appraised, they would usually give the figures back to the customer; that this was usually written in the Offer to Purchase [Plaintiff's Exhibit 5]; that he thinks a separate sheet was used to record the negotiations in this case because he recalled Mr. Serio writing something on other sheets of paper; and that normally in a lease, the actual cost of the vehicle does not figure in because customers just work out a payment within their budget.

Pat Davis, the Finance and Insurance Manager for McGill's testified that she had been in the finance office for about ten years; that the salesmen take her a deal packet or deal jacket, which has information on the front regarding what the customer was told [Plaintiff's Exhibit 14]; that she worked on the deal with the plaintiffs; that Mr. McCall gave her the paperwork; that when she got the plaintiff's deal jacket all she had to do was load the information in the machine to come up with $369 per month; that there were no instructions on the deal jacket regarding a trade-in vehicle; that this information is usually on the front of the deal jacket; that she treats equity as cash down, but there were no instructions on the plaintiff's deal jacket; that she completed the lease agreement; that her job was to adhere to the instructions regarding the monthly payment; that she submitted the plaintiff's credit application to Valley National Financial Services Company ("Valley") and they accepted it; that lease companies have their own lease factors set forth in block 15 of the lease agreement [Plaintiff's Exhibit 8]; that Valley charges an acquisition fee of $595 which is not negotiable and which is amortized over the life of the lease; and that this fee was not disclosed on the plaintiff's lease agreement. When Ms. Davis was asked why "N.A." was put in the blanks referring to trade-in values in block 16 of the lease agreement she explained that the trade vehicle is bought by McGill's; that the leasing company is equivalent to the bank and purchases the lease vehicle from McGill's; that the leasing company has nothing to do with a trade-in and does not want the trade-in vehicle; that if there is positive equity in the trade-in vehicle, it would show up in block 16(a)(1) as a cash payment; that since this was not on the front of the plaintiff's deal jacket, she assumed there was no positive equity; that "N.A." is used as opposed to "0" (zero) because the computer would not accept a "0"; and that "N.A." means "0" to her. Ms. Davis admitted that she can complete a worksheet by hand, however. Consistent with Ms. Davis' testimony is the testimony of Mr. James A. Ward, the credit manager for Bank One, of which Valley is an affiliate

[Doc. 38, Ward deposition]. Mr. Ward testified at his June 26, 1998, deposition that Valley gives no instructions to a dealer regarding what they must put in the lease agreement regarding a trade-in; that it makes no difference to Valley whether the trade-in is disclosed on the lease agreement [*id.*, at 32]; that regarding block 16(a), Valley does not require that "N.A." be placed there; and that they just require that the blank be filled in and not blank [*id.*, at 33]. Ms. Davis further testified that the customer usually writes a check for the amount due on leasing as set forth in block 16(h); that she did not collect a check from the plaintiffs in the amount set forth in block 16(h) of the plaintiff's agreement; that Mr. McCall told here there was to be no money out of pocket; that she does not recall the plaintiffs asking why "N.A." appeared in blocks 16(a)(1) and (2); that she does not recall the plaintiffs asking any questions; that she does not give customers a copy of the contract unless the customer insists; that she waits until the deal is finalized by the bank and then mails a copy of the contract to the customer; that the plaintiffs came back several days after the contract was finalized and asked for a copy of the lease agreement and she gave it to them; that the plaintiffs paid nothing for the Toyota Autocare service and that the $595 for this service was not included in their payment; that any extended warranty would be disclosed in paragraph 21 of the lease agreement; that the cost of the extended warranty ($1275) [*see* Plaintiff's Exhibits 15 and 16] was not passed on to the Myers; that this was an internal charge that did not change the plaintiffs' payment; that McGill's paid off the lien on the plaintiffs' '95 Camry for $11,120.75; that this is what it cost McGill's to receive title to the '95 Camry; that the "boarding pass" in the plaintiff's transaction shows that actual cash value of the plaintiffs' trade was $16,-200 [Plaintiff's Exhibit 29]; that Jay Hill initialed the plaintiffs' boarding pass; and that the actual cash value figure, buy off

amount and positive equity are written in Michael Bryant's handwriting.

Mr. Jay Hill, the General Sales Manager for defendant, testified that he does not think he appraised the plaintiffs' '95 Camry; that the plaintiffs' concern was obtaining a more powerful car and an acceptable payment; that he did not speak directly to the Myers on March 27, 1997 when they came to McGill's; that he was communicating with the Myers through Messrs. McCall and Serio; that the information communicated to him by Mr. McCall or Mr. Serio was that they had reached an agreement with the plaintiffs; that he does not recall anyone appraising the plaintiffs' '95 Camry at $18,000; that no one was authorized to offer that amount; that the appraisal is usually communicated by a salesman; that he does not disagree that an appraisal was done; but that he just does not know who did it or for how much; that it is not totally impossible for the appraiser to communicate with the customer, but that it is a very isolated situation; that they were very busy on the day that the Myers came in; that he was "desking the deal"—i.e., he was communicating with the salesman and running the figures as the salesman do not have the authority to make deals themselves; that after a deal is agreed on, the salesman must finish the paperwork; that regarding the plaintiffs' deal, he wrote instructions on the front of the deal jacket as to how he arrived at the monthly payment; that all the instructions were there and he did not talk to Pat Davis; that he came up with the information based upon the payment the Myers had agreed to; that there was no information regarding equity in a trade-in because nothing about trade equity was communicated to him; that it was not part of the deal as he understood it; that if it had been, it would have been communicated to him; that the plaintiffs were trying to achieve a payment; and that nobody communicated anything to him except that the plaintiffs were interested in a payment under $400 per month. Mr. Hill testified on cross-examination, however, that he

knew there was a trade-in; and that he knew the plaintiffs had brought in a second car to try to trade for some reason. Mr. Hill further testified that it is not unusual for a customer not to receive their equity; that he remembers meeting with the Myers on April 5, 1997, for about 45 minutes; that it was a pleasant meeting and he remembers that they had some concerns he could not address; that he did not tell them at this meeting that they were getting no credit for their positive equity; that it was not his place to do so; that if the plaintiffs had asked for positive equity consideration, he would have considered it; that he did not feel that he had to tell them about the equity; that they gave the plaintiffs what they wanted and the plaintiffs left; that the deal was not to give them something back; that they were supposed to touch base when the Myers got back from vacation; that he saw the Myers again on April 16, 1997 and gave them a good faith payment for $500; that he went back into the dealership and later had a heated discussion with the plaintiffs; and that he had no further role with the plaintiffs.

Mr. Rick McGill testified at a deposition that one of the three managers (the used, the new, or the general) appraises cars [Doc. 39, McGill deposition at 36]; that whether a customer gets credit for any positive equity the customer has in a trade-in depends on whether the customer is a good or "shrewd" negotiator; and that if the customer does not negotiate for the positive equity, then it is typical to just give the payoff amount for the trade-in [id., at pp. 62–63]. Despite the fact that the undisputed evidence of record demonstrates that McGill's paid only $11,120.75 for the plaintiffs' '95 Camry; that it only cost McGills this amount to receive title to the '95 Camry; and that the plaintiffs received no credit for their positive equity in the '95 Camry, McGill's reported in its books that the plaintiffs' '95 Camry was bought by McGill's for $16,200, the actual cash value of the '95 Camry as set forth on the plaintiffs' "boarding pass" and indicat-

ed a $5,079.25 downpayment on the '97 Camry when no such downpayment was ever made [Doc. 30, McGill deposition at pp. 85–87; 91]. The plaintiffs' '95 Camry was sold by McGill's for $18,908.97 [id., Exhibit 19]. Thus, McGill's books reflect a profit of only $2,708.97 when its actual profit was $7,788.22. Mr. McGill also admitted that a customer cannot tell from the lease document whether they received any credit off the capitalized cost of a vehicle with a trade-in [id., at 64]. He testified that the net trade-in allowance does not have to be disclosed in a lease [id., at 74].

In an agreed Pretrial Order filed on June 12, 1998, the defendant stipulated that the plaintiffs received no credit on the lease for the trade-in of their '95 Camry [Doc. 19].

## TENNESSEE CONSUMER PROTECTION ACT

Plaintiffs contend that the defendant's use of the terms "NA" on the lease documents with regard to the plaintiff's trade-in, defendant's failure to explain its intentions with regard to the trade-in in response to questions about the terms "NA," and the defendant's omission of any reference to the treatment of the equity in the lease documents deceived them into consummating a lease that was unconscionable and unfair and was intended to take advantage of them; that McGill's never intended to honor its promise as advertised to give a trade-in credit of up to twenty percent over book value for trade-in on the lease offered to the Myers; that defendant's policies were designed so that defendant could find out what payment the customer could afford and then structure the lease terms around that payment, without any consideration of the value of the vehicle or any equity in a trade-in vehicle; that the addition of an acquisition fee without disclosure of such a charge resulted in an inflated monthly payment; and that all of the foregoing constitute

violations of the Tennessee Consumer Protection Act, T.C.A. §§ 47–18–104(9) and (27).

■ Tennessee Code Annotated § 47–18–102 sets forth the purposes of the Tennessee Consumer Protection Act as follows:

> The provisions of this part shall be liberally construed to promote the following policies:
>
> (1) To simplify, clarify, and modernize state law governing the protection of the consuming public and to conform these laws with existing consumer protection policies;
>
> (2) To protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state;
>
> (3) To encourage and promote the development of fair consumer practices;
>
> (4) To declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state; and
>
> (5) To promote statewide consumer education.

Section 47–18–104(b) sets forth specific unfair or deceptive acts or practices deemed to affect the conduct of any trade or commerce and additionally declares the following unlawful:

> (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person; . . . .

It is not necessary for an unfair or deceptive act to be willful or knowingly made to recover actual damages under the Consumer Protection Act. *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 12 (Tenn. App.1992), *perm.app. denied, id.*

■ I find the testimony of the Myers to be credible and undisputed on key issues. Specifically, after a careful evaluation of the evidence of record, I find the following pertinent facts to be true:

1. McGill's was having a promotion on March 27, 1997 and the plaintiff's had received a flyer in the mail about this promotion. The plaintiffs' testimony on this fact is supported by Mr. McCall's testimony that there was a promotion going on the day that the Myers came in because Mr. Serio was associated with promotions, although Mr. McCall did not remember the terms of the promotion. Similarly, Ms. Davis testified that McGill's always has a promotion going on and most all of them are "mail-outs." No one provided any evidence to dispute the terms of the promotion as testified to by the plaintiffs.

2. The terms of the promotion were that McGill's was offering 20% above book value on trade-ins.

3. On March 27, 1997, the plaintiffs were interested in purchasing a new Toyota with a more powerful engine, i.e., a V–6. Ms. Myers' daughter owned a 1988 Cressida and the Myers owned a 1995 Camry, either of which the plaintiffs were considering trading in on a new car.

4. Mr. Myers contacted his credit union to determine the book values of both the Cressida and the Camry. He determined that the book value of the Cressida was about $5,000, and that the book value of the '95 Camry was about $15,000.

5. In light of the defendant's 20% above book value offer, Mr. Myers determined that the Cressida should be worth about $6,000 on a trade-in; and that the '95 Camry should be worth about $18,000 on a trade-in.

6. The Myers first took the Cressida to McGill's with the thought of trading it in on a new Toyota. Tim McCall was the salesman who initially engaged the plaintiffs and the plaintiffs test drove a couple of cars.

7. Plaintiffs decided that they were interested in purchasing the '97 Camry, but told Mr. McCall that they needed to know the appraised value on the Cressida.

8. McGill's offered plaintiffs only $5,000 trade-in value on the Cressida. Mr. Myers rejected this offer in light of his knowledge that $5,000 was the book value of the Cressida and that McGill's had not offered 20% above that value.

9. The plaintiffs made known their decision to return home and bring their '95 Camry back for an appraisal since the appraisal on the Cressida was not acceptable.

10. Mr. Serio suggested that the plaintiffs drive the '97 Camry home to pick up the other car. Thus, Ms. Myers drove the Cressida while Mr. Myers drove the '97 Toyota.

11. The plaintiffs returned late in the afternoon of March 27, 1997, with the '95 Camry. They had already made up their minds that they wanted to purchase the '97 Camry so they parked the '95 Camry in front of the showroom to be appraised.

12. The plaintiffs' '95 Camry was appraised. No one disputes that the plaintiffs' Camry was appraised. According to Mr. McGill, appraisals are performed by one of the three used, new, or general managers. Mr. McCall testified that Mr. Hill was the sales manager on site on March 27, 1997.

13. Prior to the appraisal being communicated to the plaintiffs, Mr. Myers decided to try a leasing arrangement and told Messrs. McCall and Serio that he wanted to keep his payment less than $400 per month.

14. Although it is not clear precisely who communicated an $18,000 figure to Mr. Myers for the '95 Camry, I find that the credible testimony in this case demonstrates that such an offer was made to Mr. Myers in this case. Mr. Myers is a highly intelligent individual who had done his homework prior to car shopping on March 27. He knew the book values of his two

vehicles and had figured 20% above these values to determine what he would consider an acceptable trade-in offer from McGill's on these vehicles. Mr. Myers rejected an offer that did not meet his expectations on the Cressida. Mr. Hill, Mr. McCall and Mr. Serio were all three aware of this. The defendant has proffered no reason why Mr. Myers would have accepted an offer less than what he was expecting with regard to the '95 Camry, particularly in light of the fact that the '95 Camry was in excellent condition, had never been wrecked, and had only about 31,130 miles on it. Mr. Hill testified that he could not remember what the appraisal figure on plaintiffs' '95 Camry was.

15. When the defendant offered the plaintiffs $18,000 for their '95 Camry, Mr. Myers accepted the offer and considered that he and the defendant had a deal.

16. In light of the fact that the plaintiffs had rejected the trade-in offer by defendant on the Cressida and brought their '95 Camry to defendant for an appraisal; that Messrs. Hill, Serio, and McCall were all aware of these facts; and that the plaintiffs waited for an appraisal on their '95 Camry before discussing the terms of their lease agreement, the defendant was well aware that the trade-in value and the equity in the vehicle that the Myers' traded was important to them and would figure into their decision to do business.

17. Mr. Serio wrote a payment of $369 per month down on a calendar blotter, and Mr. Myers accepted this monthly payment. I find further, however, that Mr. Myers was under the impression that the positive equity in the '95 Camry that he was trading in had been used to calculate his monthly payment on the '97 Camry.

18. Once the plaintiffs had agreed to their monthly payment, they went to the Finance and Insurance Office to see Ms. Davis.

19. When the terms of the lease agreement were completed by Ms. Davis and the lease agreement was given to Mr. Myers to read and sign, he noticed that in blocks 16(a)(1) ("Cash Payment") and (a)(2) ("Net Trade-in Allowance"), the letters "N.A." were typed in the blanks.

20. Mr. Myers specifically asked Ms. Davis why "N.A." appeared in these blanks as he knew there had been a trade-in, and Ms. Davis responded that this information was not needed on the lease agreement and would be taken care of later. The testimony of Ms. Davis and Mr. Ward support the Myers' testimony regarding Ms. Davis' explanation of the "N.A." in the pertinent blanks. Ms. Davis testified that the leasing company has nothing to do with any trade-in. Similarly, Mr. Ward testified that it makes no difference to Valley whether a trade-in is disclosed on the lease agreement; and that the only requirement Valley has is that block 16(a) not be left blank.

21. Ms. Davis knew at this time, however, that the plaintiffs were receiving no credit for the equity in their trade-in.

22. Ms. Davis had been told not to collect any money from the plaintiffs and did not collect any money from the plaintiffs for the amount due on lease signing set forth in block 16(h) of the lease agreement.

23. McGill's satisfied the plaintiffs' obligation on the '95 Camry in the amount of $11,120.75.

24. McGill's reported that the plaintiffs' 95 Camry cost it $16,200, when he paid only $11,120.75 to receive title to the vehicle.

25. When Mr. Myers returned home and began looking at the documents that Ms. Davis had placed in an envelope for plaintiffs to take home, he realized that he did not have a copy of the lease agreement or any other document that disclosed an accounting of plaintiffs' equity in their '95 Camry.

26. Mr. Myers contacted Ms. Davis the next day and requested a copy of the lease agreement and Ms. Davis stated that she would mail him a copy.

27. Mr. Myers did not receive the lease agreement in the mail and returned to McGill's to personally pick up a copy of the lease. Ms. Davis provided Mr. Myers a copy of the lease agreement.

28. Mr. Myers reviewed a copy of the lease agreement and told Ms. Davis that there was nothing on that document that showed how the $7,000 in equity on the '95 Camry had been used. Ms. Davis did not respond to Mr. Myers and he left the dealership.

29. Mr. Myers called Rick McGill the next day. Mr. McGill referred Mr. Myers to Jay Hill. Mr. Hill agreed to meet with the plaintiffs on April 5, 1997, at which time Mr. Myers expressed his desire to have an accounting of the equity in the '95 Camry.

30. Mr. Hill had the deal jacket with him when he met with the Myers on April 5, 1997, and was, therefore, aware at that time that the plaintiffs had been given no credit on their lease for the equity in the '95 Camry. Despite this knowledge, Mr. Hill told the Myers that he could not give them the exact figures they were requesting at that time and that they should meet when the Myers returned from their vacation.

31. The plaintiffs did not learn until after this suit had been filed that they received absolutely no credit on their lease from the trade-in of the '95 Camry.

Based upon the foregoing, I find that the plaintiffs made it known to the defendant that the trade-in value of the vehicle they traded in was critical to their decision to do business; that plaintiffs were offered $18,000 trade-in value on the '95 Camry for which they were led to believe they would receive credit; that plaintiffs' past experience in purchasing automobiles reasonably contributed to their belief that they would receive credit for their positive equity

without "negotiating" for it; that the fact that the plaintiffs were not required to pay any of the amount due on lease signing as set forth in their lease agreement further contributed to their belief that they were receiving credit for their equity; that the plaintiffs had never leased a car before and that the defendant was aware of this fact; that after the loan on their '95 Camry was paid off in the amount of $11,120.75, the plaintiffs had $6,879.25 in positive equity in their '95 Camry; that use of the abbreviation "N.A." in block 16 of the lease agreement is misleading; that the misleading nature of the abbreviation "N.A." was exacerbated by Ms. Davis' response to Mr. Myers' question regarding the use of same when she explained that the trade-in figure was not necessary on the lease document and would be taken care of later; that the plaintiffs were specifically misled into believing that they had received credit from their trade-in, but that it simply did not appear on the lease document; that if blocks 16(a)(1) and (2) had used the number "0", the Myers would have been put on notice that they were receiving no credit toward their lease from their trade-in; that, alternatively, if Ms. Davis had explained to the plaintiffs at that moment that they were receiving no credit for their '95 Camry, the plaintiffs would not have entered into the lease agreement; that when the plaintiffs met with Mr. Hill requesting an accounting of their equity and he failed to disclose to them that they had received no credit from the equity on their '95 Camry on their lease agreement, Mr. Hill further misled the plaintiffs; and that the defendant's failure to disclose, until after suit was filed, that plaintiffs had received no credit on their trade-in evidences defendant's knowledge that the plaintiffs' equity in their '95 Camry was critical to them; and that the plaintiffs were intentionally misled into believing that they had received credit from their trade-in when they had received no credit at all. I further find that the defendant's admission that customers are not given credit for positive equity on leases unless the customer is a "shrewd negotiator" and negotiates such credit is further evidence of the willfulness of the defendant's deception. A reasonable car dealer or salesman is aware that customers who are unfamiliar with leasing and who have always purchased automobiles expect, without negotiation, to receive credit for the positive equity they have in a trade-in vehicle toward the purchase price of the automobile they are purchasing. The act of providing a customer with an appraisal on a trade-in vehicle alone leads a customer to believe that he or she will receive credit for any positive equity remaining after any lien on the traded vehicle is paid out of the appraised amount. To fail to give a customer credit for their positive equity unless the customer negotiates or bargains for such equity without notifying the customer that this is how his or her deal is being handled is in my opinion extremely deceptive and misleading.

Accordingly, I find that the defendant's practice of providing an appraisal and then failing to give the plaintiffs credit for their positive equity based upon that appraisal without notice; that the use of the abbreviation "N.A." in block 16 of the lease agreement; and that Ms. Davis' response to Mr. Myers' question regarding the use of the abbreviation "N.A." on the lease document constitute unfair and deceptive practices; that the evidence in this case demonstrates that these unfair and deceptive practices were willful and knowing, *see* T.C.A. § 47–18–103(6) (" 'Knowingly' or 'knowing' means actual awareness of the falsity or deception, but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception; . . . ."); and that the defendant has violated the Tennessee Consumer Protection Act, T.C.A. § 47–18–104(b)(27).

### CONSUMER LEASING ACT

■ Plaintiffs contend that the defendant's failure to clearly disclose that no

value would be given for the trade-in equity towards their lease agreement constitutes a violation of the Consumer Leasing Act, 15 U.S.C. § 1667a.

> Passed by Congress as an amendment to the Truth In Lending Act (TILA), 15 U.S.C. §§ 1601 et seq., the CLA purports "to assure a meaningful disclosure" of personal property lease terms to "enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing." 15 U.S.C. § 1601(b). Section 1667a of the CLA requires the lessor to provide the lessee with certain information at the consummation of the lease. A lessor who fails to comply with the disclosure requirements of § 1667a is liable to the lessee for damages. (footnote omitted).
>
> Section 1667a "imposes no substantive requirements of lease terms ... [i]nstead it merely requires adequate disclosure of lease terms." (citation omitted)
> ....

. . . . .

Recognizing that TILA-covered transactions "defy exhaustive regulation by a single statute," Congress delegated "expansive authority to the Federal Reserve Board to elaborate and expand the legal framework" surrounding the CLA. *Milhollin,* 444 U.S. at 560, 100 S.Ct. at 794 (citing 15 U.S.C. § 1604). In carrying out its duty to publish regulations that strike an appropriate balance between "meaningful disclosure" and "information overload," *id.* at 568[, 100 S.Ct. 790], the Federal Reserve Board, acting pursuant to 15 U.S.C. § 1604, promulgated "Regulation M," 12 C.F.R. § 213 et seq., to fill in the statutory gaps of the CLA. As the Supreme Court stated in Milhollin, 444 U.S. at 560, 100 S.Ct. at 794, "[i]t is appropriate to defer to the Federal Reserve Board and staff in determining what resolution ... is implied by the truth-in-lending enactments" when no expression in the statute clearly governs the issue. thus, in addition to

the familiar rules of statutory construction,[3] I must give "great weight," *Investment Company Institute v. Camp,* 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971), to the administrative regulations promulgated by the Federal Reserve Board in interpreting the CLA.

---

3. These familiar rules of statutory construction include: giving nontechnical words their "ordinary and natural meaning," *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); considering "not only the bare meaning of the word but also its placement and purpose in the statutory scheme," *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 507, 133 L.Ed.2d 472 (1995); and interpreting a single statutory word or provision in "a context that makes its meaning clear," *United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). If an administrative agency has promulgated regulations construing the statute, the court "should give great weight to any reasonable construction of the statute adopted by the agency charged with the enforcement of the statute." *Investment Company Institute v. Camp,* 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971).

*Gaydos v. Huntington National Bank,* 941 F.Supp. 669, 673 (N.D.Ohio 1996). *See also Easterwood v. General Electric Capital Auto Lease, Inc.,* 825 F.Supp. 306, 310 (N.D.Ga.1993) ("The Consumer Leasing Act was intended to provide consumers with comprehensive information about the actual costs of leasing thus enabling them to compare alternatives. S.Rep. No. 94–590, 94th Cong., 2d Sess. 1–4 reprinted in 1976 U.S.C.C.A.N. 431, 431–34. This legislation was aimed especially at 'the leasing of consumer durables—**especially automobiles**....' *Id.* at 432 ...." (emphasis added)).

12 C.F.R. § 213.4(a) (1–1–96 edition) provides the following:

> (a) *General requirements.* (1) Any lessor shall, in accordance with this regulation and to the extent applicable, make this disclosures required by paragraph (g) of this section with respect to any consumer lease. Such disclosures shall be made clearly, conspicuously, in mean-

ingful sequence, and in accordance with the further requirements of this section. All numerical amounts and percentages shall be stated in figures and shall be printed in not less than the equivalent of 10–point type, .075 inch computer type, or elite size typewritten numerals, or shall be legibly handwritten.

.　　.　　.　　.　　.

(g) *Specific disclosure requirements.* In any lease subject to this section, the following items, as applicable, shall be disclosed:

.　　.　　.　　.　　.

(2) The total amount of any payment, such as a refundable security deposit paid by cash, check or similar means, advance payment, capitalized cost reduction or any trade-in allowance, appropriately identified, to be paid by the lessee at consummation of the lease.

.　　.　　.　　.　　.

The foregoing regulation clearly requires that the disclosures required to be made by 12 C.F.R. § 213.4(g) must be clear, conspicuous, in meaningful sequence, and in accord with other requirements of section 213.4. Section 213.4(g) requires that any trade-in allowance be disclosed. Section 213.4(a) requires that all numerical amounts be stated in figures. There is no dispute in this case that the plaintiffs did not receive any trade-in allowance for purposes of altering the terms of their lease. A "figure" is "[a] written symbol representing anything other than a letter; especially, a number. *The American Heritage Dictionary of the English Language,* 490 (New College ed.1976). "Zero" is

1. [t]he numerical symbol "0"; . . . 7. Nothing; nil.

In light of the foregoing, I find that the pertinent regulations clearly require that if a customer is receiving no trade-in value toward a lease agreement, then this must be set forth clearly and conspicuously in the lease agreement and it must be set forth in figures., i.e. "0." Accordingly I

further find that the use of the abbreviation "N.A." to disclose the net trade-in value in this case is a clear violation of the Consumer Leasing Act, particularly 12 C.F.R. §§ 213.4(a)(1) and (g).

## DAMAGES

### A. *Tennessee Consumer Protection Act*

 Tennessee Code Annotated § 47–18–109(a)(1) provides that any person who suffers an ascertainable loss of money as a result of the use of an unfair or deceptive act or practice may bring an action individually to recover actual damages. T.C.A. § 47–18–109(a) further provides the following:

(3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.

(4) In determining whether treble damages should be awarded, the trial court may consider, among other things;

(A) The competence of the consumer or other person;

(B) The nature of the deception or coercion practiced upon the consumer or other person;

(C) The damage to the consumer or other person; and

(D) The good faith of the person found to have violated the provisions of this part.

I find that the plaintiff's actual damages for the defendant's deceptive practices is the difference in the monthly payment they have been assessed and the monthly payment they should have been assessed if they had been credited with their equity. The correct monthly payment is calculated using the Valley Lease Worksheet [Doc. 38, Ward deposition, Exhibit 2] as follows:

| Initial Value of Vehicle | 1. | $28,476.00 [2] |
| Credit to initial value | 2. | 6,879.25 [3] |
| Net value of vehicle (capitalized cost) | 3. | 21,596.75 |
| Residual value | 4. | 17,689.60 |
| Total depreciation | 5. | 3,907.15 [4] |
| Monthly depreciation | 6. | 108.54 [5] |
| Monthly money factor | 7. | 112.35 [6] |
| Total monthly money factors | 8. | 4,044.96 [7] |
| Monthly lease payment | 9. | 220.90 [8] |
| Total contract receivable | 10. | 7,952.40 [9] |
| Monthly tax | 11. | 13.25 [10] |
| **Total monthly lease payment** | 12. | 234.15 [11] |

The plaintiffs were being charged a monthly payment of $393.21. The difference between $393.21 and $234.15 totals $159.06 per month for 36 months, totaling **$5,726.16 in actual damages.** In light of the fact that I find that the defendant's deception was committed knowingly, it must be determined whether the plaintiff's damages should be trebled.

I find that, although the Myers are intelligent and competent consumers, they had no experience in leasing a car and were completely unaware that by leasing a car they would lose the positive equity in the car they traded in unless they specifically negotiated for obtaining the credit for same. The defendant knew that the plaintiffs had never entered into a lease transaction for a car before. I further find that the defendant appraised the plaintiff's car, that the defendant communicated the appraised value to the plaintiffs, that plaintiffs accepted that appraisal and reasonably believed that they would receive credit for their positive equity in calculating their lease terms; that the defendant was aware that the plaintiffs believed they were receiving credit for their positive equity; that when asked about the failure of the lease agreement to set forth the net value of their trade-in, the defendant deliberately misled the plaintiffs into believing that they had received such cred-

it, but that this did not need to be disclosed on the lease agreement; that the nature of the defendant's deception is fraudulent; and that there is no evidence of good faith on the part of the defendant in this case. Accordingly, I find that treble damages in the amount of **$17,178.48** are warranted in this case for the defendant's violation of the Tennessee Consumer Protection Act. T.C.A. §§ 47–18–109(a)(3) and (4); and that plaintiffs are entitled to prejudgment interest at a rate of 10% per annum from March 27, 1997, *see* T.C.A. 47–14–123.

### B. *Consumer Leasing Act*

Title 15 U.S.C. § 1640 provides in pertinent part that

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

. . . . .

(2)(A) . . . . (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000, . . . .

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attor-

**2.** *See* Plaintiff's Exhibit 5 (initial value taken from the "Offer to Lease/Purchase").

**3.** Plaintiff's positive equity in the '95 Camry

**4.** Line 3 − Line 4.

**5.** Line 5 ÷ 36

**6.** .00286 × (Line 3 + Line 4)

**7.** Line 7 × 36

**8.** Line 6 + Line 7

**9.** Line 9 × 36

**10.** 6.0% × Line 9

**11.** Line 9 + Line 11

ney's fee as determined by the court;
. . . .

 In light of the fact that 25% of the total amount of monthly payments under the lease would exceed $1,000, I find that the defendant is liable to the plaintiffs in the amount of $1,000 for defendant's violation of the Consumer Leasing Act.

The plaintiffs are also entitled to an award of reasonable attorney's fees and costs in prosecuting this matter. Accordingly, plaintiffs shall file their motion for same within fifteen (15) days of entry hereof. In addition to plaintiffs' motion, Ms. Olive shall file a detailed, verified, itemization of time spent in connection with the prosecution of this case, a requested hourly rate for services rendered in connection therewith, and a listing of out of pocket expenses. If the defendant has any objection thereto, defendant **SHALL** respond to the plaintiffs' motion within ten (10) days of its filing.

### SUMMARY

For all of the reasons indicated herein, the undersigned finds as follows:

1. The defendant is liable to the plaintiffs for violation of the Tennessee Consumer Protection Act in the amount of $17,178.48, plus prejudgment interest at a rate of 10% per annum from March 27, 1997, to the date of this Order;

2. The defendant is liable to the plaintiffs for violation of the Consumer Leasing Act in the amount of $1,000.00; and

3. The defendant is liable to the plaintiffs for the reasonable attorney's fees and costs in this action.